ROY MARILYN STONE TRUST U/A "A", ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3232–62—3234–62. Filed June 11, 1965.

---

[1] Proceedings of the following petitioners are consolidated herewith: Roy Clayton Stone, Jr., Trust U/A "B", docket No. 3233–62; and South Philadelphia Terminal, Inc., docket No. 3234–62.

*Charles H. Burton* and *Donald L. Mooers*, for the petitioners.
*Herbert A. Seidman*, for the respondent.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax for the calendar year 1959 in amounts as follows:

| Petitioner | Docket No. | Deficiency |
|---|---|---|
| Roy Marilyn Stone Trust U/A "A" | 3232–62 | $496.06 |
| Roy Clayton Stone, Jr., Trust U/A "B" | 3233–62 | 496.06 |
| South Philadelphia Terminal, Inc. | 3234–62 | 48,599.65 |

The issues for our decision are:

(1) In determining the net income for the year 1959 of South Philadelphia Terminal, Inc., did the respondent err in disallowing, under section 162(a), I.R.C. 1954, as ordinary and necessary business expenses, a deduction claimed for alleged "commissions" in the total amount of $87,783.73 paid to M. G. Culler and U. W. Foster?

(2) In determining the net income for the year 1959 of Martinsville Rental Co., a partnership, of which the two trust petitioners are each a 25-percent partner, did the respondent err in disallowing, under section 162(a), I.R.C. 1954, as ordinary and necessary business expenses, a deduction claimed by the partnership for alleged "commissions" in the total amount of $3,025.64 paid to W. C. Beeler and N. S. Schottland?

FINDINGS OF FACT

Some of the facts were stipulated and they are incorporated herein by reference.

*Facts in General*

Petitioner, South Philadelphia Terminal, Inc. (hereinafter sometimes referred to as South Philadelphia), is a Virginia corporation, incorporated on February 23, 1954. Its office during the year in question was located at Martinsville, Va. It filed its income tax return for the year 1959 with the district director of internal revenue, Richmond, Va.

Martinsville Rental Co., a partnership, was organized on February 1, 1952. Its office and main place of business was and continues to be Martinsville, Va. It filed its partnership income tax return for the year 1959 with the district director of internal revenue, Richmond, Va.

Petitioners Roy Marilyn Stone Trust U/A "A" and Roy Clayton Stone, Jr., Trust U/A "B" were each 25-percent partners of Martinsville Rental Co. continuously from the time it was organized in 1952. U.S. Fiduciary Income Tax Returns for the year 1959 for the two trusts were filed with the district director of internal revenue, Richmond, Va.

## Facts as to Issue 1

Carolina Mirror Corp. (hereinafter sometimes referred to as Carolina Mirror) is a North Carolina corporation, incorporated on November 16, 1936. Its office and principal place of business during the years 1948 through 1959 was located at North Wilkesboro, N.C.

About 1942 the Roy Stone Transfer Corp.,[2] a common carrier, began carrying raw glass products from points in Ohio, Pennsylvania, and West Virginia to Carolina Mirror in North Wilkesboro.

During the period 1942 to 1948, Carolina Mirror delivered its finished mirror products in small trucks owned by Carolina Mirror. The market area of its products was a radius of approximately 50 miles from North Wilkesboro.

By 1948 the business of Carolina Mirror had increased and it was desired that the market area of the finished mirror products be extended. Edd F. Gardner (hereinafter sometimes referred to as Gardner), the president of Carolina Mirror, requested through Roy Stone, an individual, that the Roy Stone Transfer Corp. transport the finished products to various parts of the United States. The Roy Stone Transfer Corp. was not licensed by the Interstate Commerce Commission to travel to most of the requested destinations. Gardner was told by Roy Stone that, since Roy Stone Transfer Corp. had no operating authority in these areas, it could not transport the products. Gardner replied that, if Roy Stone Transfer Corp. did not transport these products to the designated areas, it would be necessary for Carolina Mirror to purchase its own trucking equipment and carry the finished products itself. Roy Stone knew that if this happened Roy Stone Transfer Corp. would lose its inbound freight business because Carolina Mirror would then transport the raw materials with its own trucks when they returned to North Wilkesboro.

Roy Stone offered to form a partnership consisting of his wife, Evelyn H. Stone, and his son, James C. Stone, which partnership would purchase trucking equipment and than lease such equipment to Carolina Mirror. As a result of this offer, a partnership called the Stone Co. was organized in 1947. Its partners were Evelyn H. Stone and James C. Stone, each owning a 50-percent interest.

---

[2] Sometimes referred to in the record as Roy Stone Transfer Co.

On January 2, 1948, the following agreement (hereinafter sometimes referred to as the 1948 agreement) was entered into:

This agreement made this 2nd of January 1948 between J. C. Stone and E. H. Stone, trading as partners, parties of the first part, and Carolina Mirror Corporation (North Wilkesboro, N.C.) party of the second part, WITNESSETH:

Parties of the first part have purchased a GMC truck, engine #4266302 and a Strick Trailer, serial #5771 both of which are to be titled in the name of party of the second part.

Parties of the first part agree to operate this equipment in the transportation of freight for party of the second part, for which party of the second part agrees to pay at the prevailing truck rate on all freight transported in said equipment.

Party of the second part agrees to pay the wages of the driver of the truck, including social security and withholding taxes, as well as the carrying of workmens compensation insurance; these amounts so paid are to be deducted from freight charges owed by party of the second part.

Parties for the first part agree to carry public liability and cargo insurance for this equipment, and further agree to pay all expenses of operating the equipment, including gasoline, oil, tires, repairs and licenses.

This contract shall run for one year from date, and shall thereafter renew itself from year to year, unless that 90 days before the 1st of January of any year either party shall notify the other in writing by registered mail of the cancellation to be effective at the end of the year.

Both parties hereto agree that upon cancellation of the contract or upon its termination for any cause then the party of the second part will immediately assign the title to said equipment over to parties of the first part without cost or charge; it being understood that the equitable title to the equipment is vested in parties of the first part at all times.

In witness whereof the parties of the first part and the party of the second part have caused this agreement to be executed this the day and year first above written.

(Signed) E. H. STONE
CAROLINA MIRROR CORPORATION
By (Signed) E. F. GARDNER
*President.*

Attest
(Signed) U. W. FOSTER
Witness:

The 1948 agreement has generally been referred to by Gardner, Roy Stone, and others as the leasing agreement. It is still in effect between Carolina Mirror and the successors (hereinafter mentioned) of the Stone Co.

It was the judgment of Roy Stone that probably only one truck-trailer would ever be needed by Carolina Mirror. Because of the 1948 agreement Carolina Mirror did not purchase its own trucks and trailers and the Roy Stone Transfer Corp. thereby retained the inbound freight business of Carolina Mirror.

The Piedmont Trust & Savings Bank, Martinsville, Va., financed the purchase of this first truck and trailer in 1948, as it did most of

the equipment that was purchased for use by Carolina Mirror in later years. The funds used to purchase the trucking equipment were borrowed by the Stone Co. The same company repaid the loans to the bank.

In accordance with the 1948 agreement, the legal title of the trucks and trailers purchased by the Stone Co. and its successors (hereinafter mentioned) was taken in the name of Carolina Mirror.

The primary reason for Gardner's desire to have the legal title to the equipment placed in the name of Carolina Mirror was to have Carolina Mirror's customers believe that the equipment was owned by Carolina Mirror. Another reason for taking the legal title in the name of Carolina Mirror was to avoid common carrier supervision by the Interstate Commerce Commission as Carolina Mirror would be regarded as a private rather than a common carrier.

Even though the legal title to the equipment was taken in the name of Carolina Mirror, the 1948 agreement provided that it was understood that "the equitable title to the equipment is vested in the parties of the first part at all times."

Carolina Mirror employed the drivers of the trucks. All maintenance work on the equipment was performed by the Stone Co. All expenses incurred by Carolina Mirror in the operation of the equipment were deducted from the remittance made by Carolina Mirror to the Stone Co. each month. The depreciation on the equipment was deducted on the tax returns of the Stone Co.

At the time the 1948 agreement was entered into, it was agreed by the parties that the administrative work such as the supervision of the equipment, dispatching, and all paperwork would be done by the Stone Co. The amounts paid by Carolina Mirror to the Stone Co. were worked out on that basis.

The office of the Stone Co. was located in Martinsville, Va., about 120 miles from Carolina Mirror, located in North Wilkesboro, N.C. After the initial equipment was turned over to Carolina Mirror, it was determined that it would be more practicable to have the administrative work performed at North Wilkesboro rather than at Martinsville since certain State, county, and Federal reports on the equipment turned over to Carolina Mirror would have to be made up and signed by officials of Carolina Mirror. Roy Stone requested Gardner to find someone at Carolina Mirror to do this work for which the Stone Co. would make payment on a percentage basis. Roy Stone determined that it would be better to pay the employee designated to perform the services by percentage payments rather than be committed to a straight salary since at that time it was not known how

much Carolina Mirror would use the trucking equipment, whether it would be every day, a trip a week, or a trip every month. The Stone Co. made the judgment that the percentage payment method would be the cheapest method since, if the truck did not run, there was no cost to the Stone Co. If it did run, the person responsible for supervising the operation of the equipment and for keeping the records would be paid on a percentage basis.

From a business standpoint, the agreement to have an employee of Carolina Mirror take over the complete responsibility for supervising the operation of the equipment and to maintain all reports and records, which duties the Stone Co. had agreed to perform under the terms of the 1948 agreement, was satisfactory to the Stone Co. In the first year, 1948, it cost the Stone Co. approximately $3,700 to have these services performed by an employee of Carolina Mirror. Had the Stone Co. not contracted to have this work performed by an employee of Carolina Mirror and had done this work itself as it was originally obligated to do, it would have been much more expensive because it would have been necessary for the Stone Co. to open an office in North Wilkesboro and either to hire a new employee or to send one of its employees from Martinsville to maintain the office.

Pursuant to the understanding between Roy Stone and Gardner, the latter's son, William E. Gardner,[3] was designated as the person to do the necessary work connected with the equipment. Between the years 1948 and 1952 William E. Gardner was responsible for the performance of the work which was required under the agreement and he received the percentage commission payments in return for his services pursuant to the agreement of the parties. During the period when William E. Gardner was responsible for supervising the equipment and for filing reports and maintaining the records, all of the work required was performed to the complete satisfaction of the Stone Co. The Stone Co. was satisfied that the necessary reports were filed and records properly maintained. At no time was the Stone Co. penalized for failure to file the reports. For those duties and the performance of the agreed services for which he was responsible William E. Gardner received a commission payment of 5 percent of the gross monthly payments made by Carolina Mirror to the Stone Co.

William E. Gardner was killed in an automobile accident on January 27, 1952.

Subsequent to 1952 and until 1961, M. G. Culler and U. W. Foster were the individuals designated by Gardner to perform the necessary

---

[3] Sometimes referred to in the record as William F. Gardner.

services with respect to the equipment. In return for supervising the operation of the equipment turned over to Carolina Mirror and for filing the voluminous reports and maintaining the records, these individuals received percentage commission payments based on a total of 7 percent of the gross monthly payments made by Carolina Mirror to the Stone Co. These payments continued according to the agreement entered into in 1948.

In 1955 South Philadelphia, which had been incorporated the previous year with an authorized and outstanding capital stock of 12,000 shares of common having a par value of $1 per share and owned equally by Evelyn H. Stone and James C. Stone, who were the former partners of the Stone Co., acquired the assets and assumed the liabilities of the Stone Co., including the 1948 agreement. After this acquisition, 4,000 additional shares of common stock of the par value of $1 per share were issued by South Philadelphia equally to Evelyn H. Stone and James C. Stone. James C. Stone has been president of South Philadelphia since its inception. During the taxable year 1959 the officers of South Philadelphia were: James C. Stone, president and treasurer; Roy Stone, vice president; and Evelyn H. Stone, secretary. The same three officers were also the directors of South Philadelphia for the years 1955 through 1959.

In about 1954 or 1955 the business of Carolina Mirror began to grow rapidly. Its products were marketed from coast to coast. This increase in the mirror business necessitated additional equipment being turned over to Carolina Mirror in accordance with the 1948 agreement. During that period the number of trucks so turned over to Carolina Mirror increased from 7 or 8 to over 20.

During the year 1959 South Philadelphia had between 30 and 40 trucks and trailers, the legal title to which was in Carolina Mirror. As more equipment was turned over to Carolina Mirror, the profits to South Philadelphia increased. As more equipment was so turned over, the workload of the individual, for which the percentage commission payments were made, increased proportionately.

In 1948, the first year of the 1948 agreement, the administrative cost of supervising the operation of the equipment, preparing and filing reports, and maintaining the records based upon the percentage commission payments amounted to $3,730.23. In the year 1959, based upon the percentage commission payments, the same administrative costs on the 30 to 40 units amounted to $87,783.73. The same type of reports and records continued to be filed and maintained in 1959 but the volume of the work in connection with the coast-to-coast operation of the equipment greatly expanded.

The payments made during the years 1948 through 1959 were made by the Stone Co. and South Philadelphia to the following individuals:

STONE CO. PAYMENTS

| Year | Wm. E. Gardner | M. G. Culler | U. W. Foster | Total |
|---|---|---|---|---|
| 1948 | $3,730.23 | | | $3,730.23 |
| 1949 | 6,062.07 | | | 6,062.07 |
| 1950 | 8,080.37 | | | 8,080.37 |
| 1951 | 7,794.94 | | | 7,794.94 |
| 1952 | 2,095.15 | $4,625.94 | $925.02 | 7,646.11 |
| 1953 | | 11,652.54 | 2,330.51 | 13,983.05 |
| 1954 | | 20,554.23 | 2,938.30 | 23,492.53 |
| 1955 (4 months) | | 9,523.62 | 1,360.52 | 10,884.14 |
| Totals | 27,762.76 | 46,356.33 | 7,554.35 | 81,673.44 |

SOUTH PHILADELPHIA TERMINAL, INC., PAYMENTS

| Year | Wm. E. Gardner | U. W. Foster | Total |
|---|---|---|---|
| 1955 (8 months) | $19,020.61 | $2,717.22 | $21,737.83 |
| 1956 | 37,971.94 | 4,888.85 | 42,860.79 |
| 1957 | 37,834.69 | 4,119.26 | 41,953.95 |
| 1958 | 53,175.15 | 6,310.74 | 59,485.89 |
| 1959 | 77,935.76 | 9,847.97 | 87,783.73 |
| Totals | 225,938.15 | 27,884.04 | 253,822.19 |

During the year 1959, as part of the services which were rendered for which percentage commission payments were made, trip records were maintained on the vehicles, the legal title to which was in Carolina Mirror. Reports called "Interstate Commerce Commission Exempt Commodity Receipts" were kept on the vehicles. Federal use-tax reports were prepared and filed on the equipment. Fuel reports were filed and miscellaneous correspondence was written relative to the equipment with different State and county agencies in at least 17 different States. Mileage computations of each trip were made and mileage reports were filed on the equipment with the Federal and various State and county governments. In addition to the reports and records, the designated individuals continued to be responsible for the dispatching of the equipment and for the overall supervision of the trucks and trailers. The percentage commission payments made in 1959 were in payment for these services rendered and continued to be paid pursuant to the 1948 agreement.

At all times during the period 1948 through 1959, Roy Stone, the person who originally negotiated the 1948 agreement with Gardner, believed that Gardner was not only the president of Carolina Mirror but that he was the owner as well. Gardner told Roy Stone on a number of occasions that he was the owner of Carolina Mirror. Gardner also told other people with whom he dealt that he was the owner of Carolina Mirror. He led his community to believe that he owned Carolina Mirror. He led his customers to believe that he owned

the mirror company. The real but undisclosed owners of the stock of Carolina Mirror allowed Gardner to operate with a completely free hand. It was because of this belief that Roy Stone never questioned the fact that individuals were designated to receive the percentage commission payments for the services which they were responsible to render.

In July 1961 Roy Stone discovered that Gardner was not the owner of Carolina Mirror. It was learned that G. V. Stroupe had been a 50-percent stockholder in Carolina Mirror since 1939. The other 50 percent was owned by a trust established by M. R. Schottland.

Stroupe first learned of the payments being made by South Philadelphia or the E. & L. Co.[4] to M. G. Culler and U. W. Foster about July 14 or 15, 1961. As a result of this discovery, the E. & L. Co. was requested that these payments to Culler and Foster be stopped and that thereafter the procedure for payment of the services rendered be changed from payments to the individuals who were responsible for performing the services to a deduction of 5 percent from the monthly remittances by Carolina Mirror to the E. & L. Co. Consequently, after 1961 Carolina Mirror received the payment for the performance of the services rather than the individuals who were responsible for doing the actual work relating to the equipment.

Gardner was relieved of the presidency of Carolina Mirror and was replaced by Ralph G. Buchan in December 1961.

The 1948 agreement was continued as it had been prior to July 1961 except that the payments made by Carolina Mirror were computed upon the basis of miles traveled by trucking equipment rather than the amount of the weight carried.

The services with respect to supervision of the equipment, the filing of reports with various governmental agencies, and the maintenance of records on the equipment continued to be performed by individual employees of Carolina Mirror.

Shortly after Stroupe first learned of the payments being made to M. G. Culler and U. W. Foster, Carolina Mirror asserted a claim against Gardner, M. G. Culler, and her husband, Don T. Culler (who was a vice president of Carolina Mirror), for $372,994.79, alleging that the money so paid to Culler and Foster "was rightfully the property of Carolina Mirror." The claim was compromised and settled by a mutual release and agreement made on August 1, 1961, wherein Gardner and the Cullers paid Carolina Mirror the sum of $185,080.

On its return for 1959 South Philadelphia deducted $87,783.73 for commissions. The respondent disallowed the claimed deduction. In

---

[4] At some time after the taxable year 1959, South Philadelphia was succeeded by the E. & L. Co.

a statement attached to the deficiency notice, respondent explained the disallowance thus:

(b) It is held that the deduction claimed for commissions paid to M. G. Culler—$77,935.76 and I.[sic] W. Foster—$9,847.97, a total of $87,783.73 do not constitute ordinary and necessary business expenses.

The $87,783.73 paid by South Philadelphia to M. G. Culler and U. W. Foster during 1959 was an ordinary and necessary expense in carrying on South Philadelphia's trade or business.

### Facts as to Issue 2

Virginia Mirror Co. (hereinafter sometimes referred to as Virginia Mirror) is a Virginia corporation, incorporated on September 13, 1913. Its office and principal place of business is located at Martinsville, Va.

On June 29, 1949, the officers and members of the board of directors of Virginia Mirror were:

M. R. Schottland_____ President
Hannibal N. Joyce_____ Vice president
N. S. Schottland (brother of M. R. Schottland)_____ Secretary-treasurer

In 1950, K. H. Hearn was elected a vice president of Virginia Mirror. All other officers and directors remained the same. In April 1952, W. C. Beeler was elected a vice president. All other officers and directors remained the same. In October 1954, K. H. Hearn resigned as vice president. In November 1954, W. C. Beeler became a member of the board of directors. All other officers and directors remained the same. These officers and directors remained in office through December 1960.

Virginia Mirror was one of the oldest and largest customers served by Roy Stone Transfer Corp.

In late 1956 or early 1957, M. R. Schottland (now deceased) informed Roy Stone that the business operations of Virginia Mirror were to be expanded into States which the Roy Stone Transfer Corp. could not serve under its ICC authority. It was desired that a similar type of equipment agreement as that existing (the 1948 agreement) with Carolina Mirror be entered into with Virginia Mirror. As a result of this meeting, Martinsville Rental Co., a partnership, which had been organized in 1952 (see facts in general, *supra*) purchased certain tractors and trailers and turned them over to Virginia Mirror.

On July 20, 1959, Virginia Mirror executed a document which, after listing the serial numbers and motor numbers of 4 tractors and the serial numbers of 11 trailers, stated:

The above described equipment is titled in the name of the Virginia Mirror Company, Inc. and is also being operated by it. The equitable ownership of same remains in the Martinsville Rental Company, A Partnership. We hereby

agree to return this equipment to the Martinsville Rental Company at any time the Virginia Mirror Company, Inc. does not have use for same, free from all liens and encumbrances without any payment of any kind.

During the years 1952 to 1956, the partners of Martinsville Rental Co., in addition to the two trust petitioners, were Carl M. Stone and Paul N. Stone, each owning a 25-percent interest. In 1956 Paul acquired the 25-percent interest held by Carl.

At the time the July 20, 1959, agreement was entered into by Virginia Mirror and Martinsville Rental Co., it was agreed that the president of Virginia Mirror would designate employees of Virginia Mirror to perform the supervisory duties over the equipment, to file the necessary reports with the various Federal, State, and county governmental agencies, and to maintain all records incidental to the operation of the equipment. For the performance of these services, it was agreed that the designated individuals so responsible would receive 5 percent of the gross payments made by Virginia Mirror to Martinsville Rental Co.

In 1959 the two designated individuals, W. C. Beeler and N. S. Schottland, who were responsible for the performance of the work related to the leased equipment, each received commission payments amounting to $1,512.82, or a total of $3,025.64.

Martinsville Rental Co., on its partnership return for 1959, deducted $3,025.64 for commissions. The respondent disallowed the claimed deduction. In a statement attached to the deficiency notices to the two trust petitioners, the respondent explained the disallowance thus:

(a) It is held that the deduction claimed for commissions in the amount of $3,025.64 paid to W. C. Beeler and N. S. Schottland does not constitute ordinary and necessary business expenses.

The $3,025.64 paid by Martinsville Rental Co. to W. C. Beeler and N. S. Schottland during 1959 was an ordinary and necessary expense in carrying on the partnership's trade or business.

OPINION

The parties are wide apart in their requests for findings of fact. We have found the facts substantially as requested by the petitioners. We have found that the Stone Co. and the Martinsville Rental Co. were both organized for good and valid business reasons. Prior to their organization, the Roy Stone Transfer Corp., a common carrier, was carrying freight for Carolina Mirror and Virginia Mirror but it was permitted to do so in only certain States. The businesses of the mirror companies grew tremendously and they requested the Roy Stone Transfer Corp. to carry their product throughout the United States. Roy Stone, in speaking for the Roy Stone Transfer Corp., informed the mirror companies that the Roy Stone Transfer Corp.

would not be able to accept the new business on account of the limited number of States in which it could operate.

It was then suggested by Roy Stone that a partnership consisting of his wife and son be formed as a leasing company to buy equipment and lease it to Carolina Mirror which would undertake the delivery of its products as a private carrier. The Stone Co. was formed in 1947 to acquire the necessary equipment for Carolina Mirror, and Martinsville Rental Co. was organized in 1952 along the same pattern as the Stone Co. to acquire the necessary equipment for Virginia Mirror.

It was agreed that as compensation for the so-called rental of the equipment the mirror companies would pay the prevailing freight rates less the cost of operating the equipment. The latter was to be deducted from the so-called lease rental remittance to the so-called lessor at the end of each month. These operating expenses are not here in question.

In addition to the operating expenses, it was agreed that the partnerships were to pay for certain administrative work such as supervision of the so-called leased equipment, dispatching, and the making out of numerous reports to the various States and counties in which the trucks and trailers operated and to the Federal Government. At first it was thought the partnerships could do this work but that was found to be impractical; whereupon it was agreed that the mirror companies would designate someone to perform this additional work and, in payment therefor, the partnerships would pay the persons designated a certain percentage of the so-called gross lease receipts. It is the deductibility of these percentage payments that the respondent refuses to allow.

It is the respondent's position that in substance there were no leasing arrangements made; that in substance the partnerships were common or contract carriers subject to supervision by the Interstate Commerce Commission, the same as Roy Stone Transfer Corp.; that the percentage payments were in substance in the nature of kickbacks; and that, as such, they were not ordinary and necessary expenses of the payor's business, deductible under section 162(a)(1), I.R.C. 1954.[5] In support of his position, the respondent contends that the percentage payments in question violated the declared public policies of North Carolina and Virginia which prohibit kickback payments and also that the payments violated the Interstate Commerce Act which prohibits a carrier from granting rebates, reductions, etc., to its customers.

---

[5] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

We do not think the percentage payments here in question were in the nature of kickbacks. The evidence is overwhelmingly against such a position. What the mirror companies and Roy Stone were trying to do was to arrange their business dealings in such a way that Roy Stone Transfer Corp. would retain its existing business with the mirror companies and the proposed partnerships would derive income from purchasing trucks and trailers and leasing such equipment to the mirror companies. It is true that the 1948 agreement was not titled "Lease Agreement" and the parties thereto were not referred to as lessor and lessee but merely as "parties of the first part" and "party of the second part." But we do not regard this as material. The 1948 agreement is specific in that the legal title to the equipment was to be in the name of the second party; that the first party was to operate the equipment in the transportation of freight for the second party, for which the second party was to pay the prevailing truck rate and also the wages of the drivers, including social security and withholding taxes and workmen's compensation insurance, which latter amounts were to be deducted from the freight charges; and that—

Parties for the first part agree to carry public liability and cargo insurance for this equipment, and *further agree to pay all expenses of operating the equipment*, including gasoline, oil, tires, repairs and licenses. [Emphasis supplied.]

Among the "expenses of operating the equipment" was the above-mentioned administrative work such as supervision of the equipment, dispatching, and the making out of the numerous reports that had to be made to the various States and counties, and to the Federal Government. Regarding these reports, Roy Stone, on direct examination, testified for petitioners, in part, as follows:

Q. Now Mr. Stone, you stated earlier that certain reports and records were maintained and kept on these vehicles. Did the number of reports stay constant, or did they increase in number?

A. Well, the more trucks we put on and the more states we operated in, the further these stretched out. Today we are covering every state in the United States * * * we had to file more reports to different states; * * * the leasing regulations have been revised and they call for a lot more work as the years passed on.

Q. Mr. Stone, * * * Who did this work on these leased vehicles?

A. Carolina Mirror Corporation's employees * * *

The Court. * * * Were those reports required of the Mirror Company or required of the South Philadelphia Terminal or the Roy Stone Company?

The Witness. Well, sir, your Honor, they were required partly by both, us owning the equipment—being our equipment, as far as value and we taking out depreciation on them, but by the truck being titled in the name of Carolina Mirror, then they were partly responsible, too, to see that those reports were properly maintained and filed.

The Court. Well, why did you pay them for doing the work of the Mirror Company?

The WITNESS. Well, at the time the rate was worked out to pay for this truck, it was understood with Mr. Ed Gardner of the Carolina Mirror that I would do all the paper work, all the dispatching and everything. But as we got into it, we found that the Government regulations and those of ICC would have to be done, and instead of keeping it in Martinsville, we set it up that I would pay him to do all the work.

Some of the work was my responsibility and some of it was his responsibility.

We think the percentage payments here in question in the amounts of $87,783.73 and $3,025.64 were ordinary and necessary expenses paid in carrying on a trade or business and that the amounts are deductible as such under section 162(a) of the 1954 Code and we so hold. The respondent's "primary" contention is that the percentage payments were in the nature of "kickbacks" and, as such, were not ordinary and necessary expenses of the payors' businesses. We have fully shown in our findings that there is no justification for such a contention. The payments were made for services actually and satisfactorily rendered and, as such, cannot be considered as kickbacks. As an "alternative" the respondent contends for the first time "that the petitioners have failed to show that the payments, even if compensation in nature, are reasonable in amount." The percentage payments in question were made on a contingent basis, namely, a certain percentage of the gross monthly payments made by the mirror companies to South Philadelphia and Martinsville Rental Co., respectively. The respondent's regulations, sec. 1.162–7(b)(2), on the test of deductibility of contingent compensation, are set out in the margin.[6] We fully agree with the test there prescribed. The formula for arriving at the compensation here in question was arrived at in an arm's-length transaction in 1948, over 11 years prior to the taxable year. We have set out in our findings why it was considered more reasonable to pay for the services performed on a percentage basis. The reason the percentage payments were so much larger in 1959 than they were in prior years is because the number of trucks practically doubled in that year and the base on which the payments were determined was therefore correspondingly so much larger. Since the payments were made in accordance with the formula which we find was reasonable at the time it was agreed to and made pursuant to a free and arm's-length bargain

---

[6] * * * Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.

(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.

between the parties, we think the percentage payments in question should be allowed as claimed even though in the actual working out of the formula the payments might appear, in the words of the regulations, "to be greater than the amount which would ordinarily be paid."

It may be noted in passing that at the hearing Gardner testified for the respondent that M. G. Culler did not perform any services. This is contrary to what Gardner led Roy Stone to believe in 1952 after the death of Gardner's son, William, for in 1952 M. G. Culler (Gardner's daughter) and U. W. Foster were designated by Gardner to perform the services that were previously performed by William. When South Philadelphia made the payments of $87,783.73 to M. G. Culler and U. W. Foster it clearly was under the impression that Gardner was the owner of all the stock of Carolina Mirror. In any event, the services were performed to the satisfaction of all concerned and South Philadelphia was obligated to pay for them in accordance with the formula then in effect.

It may also be interesting to note that after Gardner severed his connection with Carolina Mirror, the successor of South Philadelphia (the E. & L. Co.) continued under the 1948 agreement to pay for making the reports, except the percentage payments were made direct to Carolina Mirror instead of to individual employees of Carolina Mirror.

We hold that the respondent erred in disallowing the percentage payments in question. Because of other adjustments made by the respondent which are not at issue,

*Decisions will be entered under Rule 50.*