CECIL RANDOLPH HUNDLEY, JR., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3075–64.   Filed June 19, 1967.

*Robert Ash* and *Donald L. Mooers*, for the petitioner.
*Douglas O. Tice, Jr.*, for the respondent.

HOYT, *Judge:* Respondent determined a deficiency in petitioner's income tax for 1960 in the amount of $5,334.85. The only question presented for our decision is what portion of a $22,000 cash bonus earned by petitioner in 1960 for signing a professional baseball contract is deductible as the reasonable value of services actually performed by petitioner's father.

FINDINGS OF FACT

The stipulated facts are found accordingly and adopted as our findings.

Cecil Randolph Hundley, Jr. (hereinafter referred to as petitioner), filed his 1960 income tax return with the district director of internal revenue, Richmond, Va. Martinsville, Va., was his legal residence at the time petitioner filed the petition herein. Petitioner is a professional baseball player and at the time of trial was a catcher for the Chicago Cubs of the National League.

Petitioner's father, Cecil Randolph Hundley, Sr. (hereinafter referred to as Cecil), is a former semiprofessional baseball player, and he has also been a baseball coach. Cecil played as a catcher throughout his baseball career, and received numerous injuries to his throwing hand while using the traditional two-handed method of catching. This is a common problem of catchers. A few years before Cecil retired from active participation in baseball as a player, he developed a one-handed method of catching which was unique and unorthodox. This technique was beneficial because injuries to the catcher's throwing hand were avoided. Cecil became actively engaged in the construction and excavation business in 1947 and was still engaged in that business at time of trial.

Petitioner attended Bassett High School near Martinsville, Va., from which he graduated in June of 1960. During 1958 petitioner was a member of his high school baseball team and the local American Legion team. He played catcher for both teams and was an outstanding player. In the spring of 1958, while a sophomore in high school, petitioner decided that he wanted to become a good major league professional ball player. Petitioner believed that Cecil was best qualified to coach and train him for the attainment of this goal. After discussing his ambition with Cecil, an oral agreement was reached between petitioner and Cecil. Cecil agreed to devote his efforts to a program of intensive training of petitioner in the skills of baseball, to act as petitioner's coach, business agent, manager, publicity director, and sales agent in negotiating with professional baseball teams for a contract. His role may best be described in petitioner's own words used when he first asked Cecil to handle things for him in 1958: "Daddy, do the business part and let me play the ball."

As compensation for Cecil's services, it was agreed that Cecil would receive 50 percent of any bonus that might be received under the terms of a professional baseball contract if one should later be signed. This contingent payment agreement was thought to be fair and reasonable by the parties since it was unknown at that time whether petitioner would ever develop into a player with major league potential or sign

a professional baseball contract or receive a bonus for signing. Moreover, petitioner could not sign a baseball contract while still a minor without his parent's consent or until he graduated from high school. The size of baseball bonuses obtainable at some unknown time, years in the future, was extremely conjectural. A rule limiting bonuses to $4,000 for signing baseball contracts had been suspended in 1958 and its reinstatement was a definite possibility before 1960. It was not expected by petitioner or Cecil at that time that an exceptionally large bonus would ever be received. Later on they estimated that at most $25,000 might be paid to petitioner as a bonus.

Between the spring of 1958 and petitioner's graduation from high school in 1960, Cecil devoted a great deal of time to petitioner's development into the best baseball player possible. Cecil became petitioner's coach and taught petitioner the skill of being a one-handed catcher. While this method is advantageous, it is difficult to master because it is contrary to natural instincts. The perfection of this unorthodox technique therefore required an inordinate amount of time and effort by the teacher and the pupil. Cecil also taught petitioner to be a power hitter in order to further enhance petitioner's appeal to professional baseball teams. Petitioner weighed only 155 pounds during his high school days which was a decided handicap for him both as a hitter and a catcher hoping to break into the big leagues.

Cecil attended every baseball practice session and every home and away game in which petitioner participated between 1958 and 1960. On many of these occasions he met with scouts for big league teams. By mutual agreement, Cecil relieved petitioner's high school and American Legion coach from any duties with respect to petitioner. It was agreed between the coach and Cecil that it would be in the petitioner's interest for Cecil to be in complete charge of the training program. Cecil supplied petitioner with baseball equipment at his own expense during this period.

In order to obtain the best possible professional baseball contract for petitioner, Cecil had many meetings with members of the press during the 2-year period from the spring of 1958 to June 16, 1960, to publicize petitioner's skill as a baseball player. Cecil handled all the negotiations with representatives of the many professional baseball teams that became interested in petitioner. This undertaking involved numerous meetings at home and out of town. Cecil left Sundays open for such negotiations for the entire 2-year period but negotiations often occurred on other days of the week. Cecil was never paid anything for the considerable expenses he incurred over the 2-year period.

The amount of compensation to be received by Cecil was contingent on the obtainment and size of a bonus to be paid petitioner for signing

a professional baseball contract. In determining the percentage of the possible bonus to be received by Cecil, the parties also gave consideration to Cecil's increased expenses and the anticipated loss of time and income from his construction business. Cecil had to neglect his business and he lost several substantial contracts during the period of petitioner's intensive training. The amount of time he devoted to his grading and excavating business was substantially reduced during 1958, 1959, and 1960 with corresponding loss of business income.

Petitioner developed into an outstanding high school baseball player under Cecil's tutorage and by 1960 many major league clubs had become interested in signing him. Due to the rule requiring high school graduation before signing a baseball contract, extensive final negotiation sessions with representatives of the various major league baseball teams did not begin until after petitioner's graduation in 1960.

The final negotiation sessions were held at Cecil's home and after 2 weeks resulted in a professional baseball contract signed by petitioner on June 16, 1960. All of the negotiations with the many major league clubs bidding for petitioner's contract were handled by Cecil in such a way that the bidding for petitioner's signature was extremely competitive. Representatives of the various baseball teams were allowed to make as many offers as they wanted during the 2-week period, but the terms of any offer were not revealed to representatives of other teams. Cecil's expert and shrewd handling of the negotiations was instrumental in obtaining a most favorable contract and an extraordinarily large bonus for the petitioner.

The baseball contract finally signed by petitioner was with a minor league affiliate of the San Francisco Giants of the National League. The contract provided for a bonus of $110,000 to be paid over a 5-year period at the rate of $22,000 per year, $11,000 to petitioner and $11,000 to Cecil, and a guaranteed salary to petitioner of not less than $1,000 per month during the baseball playing season for a period of 5 years. Cecil bargained for and insisted upon the minimum salary provision in addition to the large bonus because of his expectation that petitioner would be playing in the relatively low paying minor leagues for at least 5 years. Cecil also signed the contract because under the rules of professional baseball the signature of a minor was not accepted without the signature of his parent.

The baseball contract contained the following pertinent provisions:

1. The Club hereby employs the Player to render, and the Player agrees to render, skilled services as a baseball player in connection with all games of the Club during the year 1960, including the Club's training season, the Club's exhibition games, the Club's playing season, any official series in which the Club may participate, and in any game or games in the receipts of which the Player may be entitled to share. The Player covenants that at the time he signs this contract he is not under contract or contractual obligation to any baseball club

other than the one party to this contract and that he is capable of and will perform with expertness, diligence and fidelity the service stated and such other duties as may be required of him in such employment.

2. For the service aforesaid subsequent to the training season the Club will pay the Player at the rate of $ one thousand dollars ($1,000) per month * * * after the commencement of the playing season * * * and end with the termination of the Club's scheduled playing season and any official league playoff series in which the Club participates. * * *

*     *     *     *     *     *     *

14. If Player is to receive or has received any additional compensation of any nature or kind whatsoever from the Club or from any other source whatsoever in connection with this contract which is not set forth in paragraph 2 of this contract, it must be inserted below, giving name of payor, amount and nature of payment, when paid or to be paid, etc.

Player is to receive cash bonus of one hundred and ten thousand dollars (110,000) payable as follows:

Eleven thousand dollars ($11,000) upon approval of this contract by the National Association of Professional Baseball Leagues. Also eleven thousand dollars ($11,000) on Sept. 15, 1961; Sept. 15, 1962; Sept. 15, 1963; Sept. 15, 1964.

The father, Cecil R. Hundley, is to receive eleven thousand dollars ($11,000) upon approval of contract by the National Association of Professional Baseball Leagues. Also eleven thousand dollars ($11,000) on Sept. 15, 1961; Sept. 15, 1962; Sept. 15, 1963; and Sept. 15, 1964.

An additional handwritten paragraph was also attached to the contract form which provided as follows:

6-16-60   This is to certify that the salary of C. Randolph Hundley, Jr., of Box 1389, Martinsville, Va. (Covington Road) is to be not less than $1,000 per month for the length of his contract (Running to 1964).

The designation of $11,000 to be paid annually to Cecil for 5 years was a consequence of the agreement between Cecil and petitioner to divide equally any bonus received by petitioner for signing a professional baseball contract. The scout for the San Francisco Giants who negotiated the contract was aware of the aforementioned agreement before the contract was written, and the terms of the contract reflected the prior understanding of the contracting parties with respect to the division of the bonus payments. Petitioner's high school coach also knew of the 50–50 bonus agreement between petitioner and Cecil and had been aware of it since its inception in 1958.

During the 1960 taxable year which is in issue, petitioner and Cecil each received $11,000 of the bonus from the National Exhibition Co. pursuant to the terms of the contract. Petitioner did not include the $11,000 payment received by Cecil in his gross income reported in his income tax return for 1960. Cecil duly reported it in his income tax return for that year.

The notice of deficiency received by petitioner stated that income reported as received from the National Exhibition Co. was understated by the amount of $11,000. The parties are apparently in agreement

that petitioner understated his income for 1960 in the determined amount, but petitioner contends that an offsetting expense deduction of $11,000 should have been allowed for the payment received by Cecil as partial compensation for services rendered under the 1958 agreement between petitioner and Cecil. Respondent's position on brief is that only a $2,200 expense deduction, 10 percent of the total bonus payment in 1960, is allowable to petitioner in 1960 as the reasonable value of services performed by Cecil.

The contract between Cecil and petitioner was made in 1958; it was bona fide and at arm's length, reasonable in light of the circumstances existing when made and in the taxable year before us. The payment of 50 percent of petitioner's bonus thereunder to Cecil in 1960 was compensation to him for services actually rendered to petitioner. He received and kept the $11,000 of the bonus paid directly to him by the ball club.

### OPINION

Respondent's determination that an additional $11,000 should have been included in petitioner's income for 1960 is based upon section 61(a)[1] which provides that gross income includes compensation for services and section 73(a) which provides that amounts received in respect of the services of a child shall be included in the child's gross income even though such amounts are not received by the child.

It is beyond question and on brief the parties agree that the $11,000 received by Cecil actually represented an amount paid in consideration of obtaining petitioner's services as a professional baseball player. Petitioner, while agreeing with the foregoing conclusion, argues that a deduction in the amount of $11,000 should be allowed for 1960 under section 162 or 212. Respondent has conceded that such a deduction should be allowed but only in the amount of $2,200.

Section 162 provides that a deduction shall be allowed for an ordinary and necessary expense paid during the taxable year in carrying on any trade or business including a reasonable allowance for compensation for personal services actually rendered. Section 212 provides that an individual may deduct all ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income.

Respondent argues there is insufficient evidence to establish an agreement in 1958 to share any bonus equally and that even if there were such an agreement no portion paid for Cecil's services to petitioner prior to 1960 is deductible because prior to his graduation, petitioner was not in the trade or business of being a baseball player. He con-

---

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

tends that the only service performed by Cecil for which petitioner is entitled to a deduction was the actual negotiation of the June 16, 1960, contract. He concedes on brief that a reasonable value for the services rendered by Cecil during the 2-week period from graduation to signing the contract is $2,200, 10 percent of the total bonus paid in 1960.

Petitioner has introduced persuasive and convincing evidence that the agreement was in fact reached in the spring of 1958, and we have so found. This finding is essential to petitioner's position that a deduction for an ordinary and necessary business expense deduction in the amount of $11,000 should be allowed in 1960. He argues that a contingent right to 50 percent of any bonus obtained was a reasonable value for services rendered by Cecil between the spring of 1958 and the signing of the contract in 1960, and that payment for such services was therefore an ordinary and necessary expense associated with his business of professional baseball.

We agree that the 50-percent contingent compensation agreement was reasonable in amount. Section 1.162–7(b)(2)[2] of the regulations sets forth a test for the deductibility of contingent compensation which we have accepted as correct in *Roy Marilyn Stone Trust*, 44 T.C. 349 (1965). We apply the test here.

The primary elements considered by petitioner and Cecil in determining Cecil's contingent compensation were the amount of time that would be spent in coaching, training, and representing petitioner during the uncertain period between 1958 and an eventual contract. Cecil's exclusive handling of all publicity and contract negotiations and the income that would probably be lost due to less time spent on Cecil's construction business were also important factors. In addition to the foregoing considerations, emphasis should be placed on the fact that the ultimate receipt of a bonus of any kind was uncertain and indefinite. The amount was indeterminable and in 1958 neither petitioner, Cecil, nor the high school coach who was aware of the agreement had any notion that an exceptionally large bonus would be paid 2 years hence. Petitioner might well never have become a professional ballplayer, nor was it at all certain that he would be paid a bonus in the future. Viewing the circumstances at the time the agreement was

---

[2] * * * Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.

(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.

made in the light of all of the evidence before us we conclude and hold that the test of reasonableness has been met even though the contingent compensation may be greater than the amount which might be ordinarily paid.

Cecil honed the edges of petitioner's ballplaying ability to razor sharpness by his skilled and dedicated coaching. Not only did he teach him his own unique one-handed catching technique, but he made a pull hitter out of a 155 pound boy. He diligently cultivated the major league clubs' scouts, traveling around for 2 years at his own expense to keep in close touch and on friendly terms with them all. When he was not away he received them in his home, entertaining them and their families and establishing a firm and cordial relationship. He kept petitioner in the public eye by handling his publicity so that almost every major league club sought to sign a contract with petitioner immediately upon his graduation from high school when he was first available. And, finally, he conducted the final negotiations in such an unusual and skillful manner that he not only obtained a huge bonus for petitioner's signature on a contract but also a minimum salary of $1,000 per month during the playing season for 5 years. While we recognize that the reasonableness of the contingent compensation is to be viewed in the light of the circumstances when the contract for it was made and that it is immaterial that in the actual working out of the contract such contingent compensation may prove greater than the amount which ordinarily would be paid, *California Vegetable Concentrates, Inc.*, 10 T.C. 1158 (1948), acq. 1948-2 C.B. 1, citing *Austin* v. *United States*, 28 F. 2d 677 (C.A. 5, 1928); sec. 1.162-7(b)(2), Income Tax Regs., we have detailed the services performed which in our view demonstrate that the contingent compensation actually was not greater than ordinarily would be paid for so many varied skilled services.

While it is true that an agreement of this sort between a father and his minor son cannot possess the arm's-length character of transactions between independent, knowledgeable businessmen and must be most carefully scrutinized, the agreement here stands every searching test. Independent and trustworthy witnesses verified its existence since 1958. It was in our judgment and in the opinion of both petitioner and Cecil, then and at trial, fair to both parties. See *Olivia de Havilland Goodrich*, 20 T.C. 323 (1953).

Respondent contends that Cecil was an avid baseball fan and that he would have performed the same services for his son without compensation. However, he did not do so and there is no reason why he should be expected to. We are certain that a disinterested third party would not have agreed to undertake the duties and obligations assumed by Cecil without greater assurance of the resulting financial rewards.

And without doubt no one would have taken the risk of no return and still have performed with such dedication except an avid baseball fan and a skilled and devoted father. Because we are convinced of the pre-existing nature of the agreement, its reasonable nature in view of the 1958 circumstances and the extremely valuable services rendered by Cecil, we are not persuaded by respondent's arguments.

As we have already mentioned, the bonus eventually received was much larger than the parties had anticipated originally. It should not be concluded from this factor alone that the agreement was unfair and that payments received thereunder were unreasonable in amount. When the agreement was made in 1958 no bonuses of such size had been previously paid to high school ballplayers. Until that year the maximum bonus had been $4,000. However, the change in climate over the next 2 years coupled with petitioner's athletic skill and Cecil's services set the stage for the jackpot bonus which gives rise to this litigation. The combination paid off and the fact that realization was greater than expectation does not make the contract unreasonable.

We conclude and hold that the payment received in 1960 by Cecil for services rendered to petitioner between the spring of 1958 and the date petitioner's professional baseball contract was signed in 1960 is reasonable in amount and that a portion of the payment received by Cecil cannot be disallowed as a deduction on this ground.

Respondent contends further, however, that even if the bonus splitting agreement arose in 1958 and was intended to ultimately result in a reasonable amount of compensation for services rendered throughout the 2-year period, the full amount received by Cecil is still not deductible because petitioner was not engaged in a trade or business or any other income-producing activity until graduation from high school when he became eligible to sign a professional baseball contract. In order for an expenditure to qualify for deductibility under section 162 or 212, it must have been paid or incurred in carrying on any trade or business or for any other income producing or collecting activity.

Respondent has relied upon a line of cases which stands for the proposition that expenses paid or incurred preparatory to entering into a business or profession are not paid or incurred in carrying on a trade or business or for the production of income and are not deductible under either section 162 or 212. *Robert J. Wallendal*, 31 T.C. 1249 (1959) ; *Eugene H. Walet, Jr.*, 31 T.C. 461 (1958), affirmed per curiam 272 F. 2d 694 (C.A. 5, 1959) ; *Frank B. Polachek*, 22 T.C. 858 (1954) ; *Morton Frank*, 20 T.C. 511 (1953). However, the rationale behind this line of cases is that the taxpayer was not carrying on a trade or business in the taxable year in which the expenses were paid or incurred and deducted. This is not the situation here.

Respondent recognizes that petitioner was engaged in carrying on the trade or business of a professional baseball player after graduation from high school in 1960 when he signed the bonus contract. The compensation in question received by Cecil in 1960 was admittedly not due or incurred nor was it paid until petitioner was carrying on that trade or business. It could only be deductible in the year of payment since petitioner is a cash basis taxpayer. We are aware of no case, and respondent has cited none, which would bar a deduction in such a situation, even though the payment was for services rendered prior to the commencement of the trade or business.

In *Lucas* v. *Ox Fibre Brush Co.*, 281 U.S. 115 (1930), the taxpayer sought to deduct payment of additional compensation made during the taxable year in issue for personal services rendered by its officers in prior taxable years. In allowing the deduction, the Supreme Court noted that there is no requirement that the services should actually be rendered in the same taxable year as the payments made therefor, but only that the payments therefor shall be proper expenses paid or incurred during the year. See also *Associated Theatres Corporation*, 14 T.C. 313 (1950). In the *Ox Fibre Brush* case the taxpayer was on the accrual basis. The Court said:

> The payments in the present instance were actually made in the year 1920. The expenses represented by these payments were incurred in that year, for it is undisputed that there was no prior agreement or legal obligation to pay the additional compensation. This compensation for past services, it being admitted that it was reasonable in amount in view of the large benefits which the corporation had received as the fruits of these services, the corporation had a right to pay, if it saw fit. There is no suggestion of attempted evasion or abuse. * * *

Paraphrasing that language to apply to the facts here, the payment in this case was actually made in the year 1960. The expenses represented by this payment were incurred in that year for it is undisputed that prior to the execution of the June 16, 1960, baseball contract there was no legal obligation under the 1958 agreement for petitioner to share his bonus with his father. This compensation for past services, which we have found and held was reasonable in amount, petitioner not only had a right but a duty and obligation to pay in 1960. There is no suggestion of attempted evasion or abuse.

The contingent compensation agreement was so closely bound up with the existence of the petitioner's business activity of professional baseball that payments made thereunder must be considered as paid in carrying on a trade or business. If petitioner had never entered the business of professional baseball or had not been paid a bonus therefor, no payments would have been made to or received by Cecil. The whole basis of the agreement was the ultimate existence and establishment of the contemplated business activity and the collection of a bonus. We therefore conclude that payments made under the terms

of the agreement were paid for services actually rendered in carrying on a business. The obligation to make the payments to Cecil was an obligation of the business since there would be no obligation without the business. If the business were entered without payment of a bonus, there also would be no obligation to share it with Cecil. The unique relationship of Cecil's compensation to the professional baseball contract and petitioner's income derived therefrom in 1960 is most persuasive of the deductible nature of the compensation payment made that year.

Respondent's final argument, raised herein for the first time on brief, is based on the premise that the services rendered prior to high school graduation were basically educational in nature, and that educational expenditures are personal and nondeductible if undertaken primarily for the purpose of obtaining a new position or substantial advancement in position. See sec. 1.162–5(b), Income Tax Regs. We have previously held that claimed deductions for educational expenditures of the foregoing type are not allowable. *Mary O. Furner*, 47 T.C. 165 (1966); *Joseph T. Booth III*, 35 T.C. 1144 (1961); and *Arnold Namrow*, 33 T.C. 419 (1959), affd. 288 F. 2d 648 (C.A. 4, 1961).

However, petitioner is not claiming a deduction in the amount of $11,000 for educational expenditures, and indeed he could not. It is clear that a significant portion of Cecil's compensation was not for coaching and training petitioner in the skills of baseball, if that be deemed education, but for other services rendered throughout the 2-year period. These other services were varied, time consuming, and expensive for Cecil to perform and included acting as petitioner's business advisor and manager, publicizing petitioner's name, and handling press relations and preliminary contacts and negotiations with interested professional baseball teams. More than half of Cecil's time was devoted to dealing with scouts over the 1958–60 period. Finally, they included the 2 weeks of intensive negotiations leading to the final signing of the bonus contract. We agree with petitioner's contention that the elements of the contingent compensation agreement cannot be fragmented so as to place an isolated value on each of the areas in which Cecil rendered personal services. It was a package deal and cannot be sliced up into its various component parts.

The contingent compensation agreement is properly viewed as essentially a joint venture arrangement between Cecil and petitioner looking toward the eventual business of petitioner as a baseball player. Each person devoted his skills to the undertaking with the hope of eventual financial reward. We recognize that this undertaking fell short of carrying on a trade or business prior to petitioner's graduation from high school and signing his baseball contract. When the joint venture analysis is utilized, however, it seems illogical to segregate a

portion of Cecil's share and label it an educational expenditure for petitioner's improvement of his baseball skills between 1958 and 1960.

The large bonus was attributable to the mutual efforts of Cecil and petitioner. Cecil's share of the bonus is included in petitioner's gross income on the theory that the full bonus was for his future services as a professional baseball player. The preexisting obligation to share half of the bonus with Cecil had the effect of reducing petitioner's financial gain from the bonus. In effect Cecil's services were a grubstake repayable if, as and when petitioner struck it rich. It thus becomes apparent that, from petitioner's point of view, Cecil's share of the bonus was an expense of obtaining and receiving the bonus, the fruits of their combined skills and efforts, and that payments received by Cecil under the terms of the contingent compensation agreement should be so considered. No payment occurred until petitioner was carrying on a business, and the payment was directly connected with the business and reasonable in amount. The expenditure was ordinary and necessary under the circumstances.

We hold, therefore, that whereas respondent acted correctly in including the entire $22,000 bonus in petitioner's taxable income, petitioner should be nevertheless allowed a deduction in the amount of $11,000 in 1960 as a business expense for the portion of the bonus paid directly to Cecil for his personal services actually rendered with such rewarding financial results for both petitioner and his father.

*Decision will be entered for the petitioner.*