**STEPHENS MARINE, INC., Successor in interest to Stephens Brothers, Inc., Petitioner-Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 24580.**

United States Court of Appeals,
Ninth Circuit.

Aug. 26, 1970.

Rehearing Denied Sept. 16, 1970.

Robert E. Tout (argued), Stockton, Cal., for petitioner-appellant.

Ann E. Belanger (argued), Lee A. Jackson, Grant W. Wiprud, Attys., Johnnie M. Walters, Ass't Atty. Gen., Tax Div., Dept. of Justice, K. Martin Worthy, Chief Counsel, I.R.S., Washington, D. C., for respondent-appellee.

Before HAMLEY and DUNIWAY, Circuit Judges, and WILLIAMS,* District Judge.

* Honorable David W. Williams, United States District Judge, Central District of California, sitting by designation.

DUNIWAY, Circuit Judge:

The taxpayer, Stephens Marine, Inc. [Stephens Marine], successor in interest to Stephens Brothers, Inc. [Stephens Brothers] petitions for review of a Tax Court decision in favor of the Commissioner. T.C. Memo. 1969–39. We affirm. The facts are set out at length by the Tax Court. The following summary will suffice here.

The taxpayer attacks certain deficiencies in the income taxes of Stephens Brothers, for its final fiscal year ending October 4, 1960. It was stipulated that "[o]n or about August 12, 1960, the outstanding stock of Stephens Brothers, Inc., was delivered to Sea Craft, Inc. On October 4, 1960, Sea Craft, Inc. changed its name to Stephens Marine, Inc., and liquidated Stephens Brothers, Inc. into itself. For federal income tax purposes, this liquidation was effected under the provisions of Section 334(b) (2)." Only three items are now in dispute. With respect to each, the Tax Court sustained the Commissioner's deficiency.

A. *The mine sweeper contracts.*

The first two items in dispute involve a contract between Stephens Brothers and the Department of the Navy, Bureau of Ships, for the construction of three coastal minesweepers, numbers MSC 281, 282, and 283, for a total price of $5,394,407.86, subject to adjustments. It was stipulated that in all material respects Stephens Brothers and the Navy complied with the terms of the contract in billing, progress payments and retentions. The relevant contract special provisions concerning payment were as follows:

1. Progress payments "of ninety percent (90%) of an amount to be determined by applying to the total contract price [as adjusted from time to time for changes in specifications under the General Provisions, but not for changes in labor and materials costs under the Special Provisions, see below] the percentage of physical progress in the per-

formance of the contract as a whole," unless that amount exceeded the contractor's certified costs by more than five percent. Thus a total of as much as ninety percent of the total contract price [without adjustment for changes in labor and materials costs] was payable in the form of progress payments by the time work on the minesweepers was completed.

2. "Upon preliminary acceptance of each vessel * * * the Government will pay to the Contractor the amount withheld * * * in excess of three percent (3%) of the contract price of such vessel as adjusted by change orders, said percentage consisting of (i) a performance reserve of two percent (2%) and (ii) an additional reserve for final settlement of one percent (1%). * * *"

Preliminary acceptance, therefore, meant that a total of 97 percent of the contract price (again, as adjusted for change orders, but not for changes in labor and materials costs under the Special Provision) was payable to Stephens Brothers. The contract continued:

"(c) The Government shall, at the time of final settlement, * * * pay the Contractor the balance owing to it under the contract promptly after the amount of such balance shall have been determined."

"(d) The Government may, in its discretion, make payments prior to final settlement on account of the reserves established under this Article subject to such conditions precedent as the Contracting Officer may prescribe."

The General Provisions established a 3-month "guaranty period" immediately following preliminary acceptance, during which time the minesweeper would "after being fully equipped and armed and in all respects complete and ready for service, * * * be finally tried by and at the expense of the Government under conditions prescribed by the Secretary * * *." It was further provided

that the vessel "shall be finally accepted, upon the expiration of its guaranty period" if it was found to have met the plans and specifications, and that:

"Upon final acceptance of the vessels * * * the contractor shall be entitled to receive the balance owing to it under this contract, such payment to be made promptly after the amount of such balance shall have been determined. The Contractor * * * shall execute and deliver at the time of and as a condition to final payment, a release * * * containing such exceptions as may be found appropriate by the Contracting Officer, discharging the Government, * * * from any liabilities, obligations and claims arising under this contract. The Contracting Officer may authorize partial payments on account of any such balance to be made in advance of final settlement. * * *"

The Special Provisions concerning changes in labor and materials costs were designed to adjust the contract price upward or downward to reflect changes in the contractor's labor and materials costs; they were tied to Department of Labor statistics. Those adjustments were deferred until final settlement, although the Government might make partial payments on the basis of tentative adjustments before final settlement.

One of the minesweepers, MSC 281, was completed, delivered, and preliminarily accepted during Stephens Brothers' fiscal year ending October 31, 1959. However, the guaranty period had not expired, and the vessel was not finally accepted until Stephens Brothers' final fiscal year, ending October 4, 1960. MSC 282 and 283 were completed, delivered, preliminarily accepted and finally accepted during Stephens Brothers' final fiscal year. Final settlement did not occur until May 15, 1964, a long time after the liquidation of Stephens Brothers.

Stephens Brothers, using a modified form of the completed contract method of accounting, reported 100 percent of the construction costs and 97 percent of the total contract price (as adjusted for change orders) of MSC 281 in its fiscal year ending October 31, 1959. When MSC 281 was finally accepted during Stephens Brothers' final fiscal year, the Navy paid the two percent performance reserve, with the exception of $6,000, which the Navy continued to retain. It retained the one percent reserve pending final settlement. Stephens Brothers included the amount of the payment on the two percent reserve in its income for its final fiscal year.

By the end of Stephens Brothers' final fiscal year, it had also been paid the 97 percent due on preliminary acceptance plus the two percent performance reserve for MSC 282 and 283. The one percent reserve for final settlement was still retained by the Navy. Stephens Brothers reported 100 percent of the construction costs and 99 percent of the contract price (as adjusted for change orders) of MSC 282 and 283 in its final fiscal year. Thus, at the end of Stephens Brothers' final fiscal year, there remained unpaid and unreported only the one percent final settlement reserves on all three boats, and the $6,000 retained by the Navy from the two percent performance reserve on MSC 281.

Had the construction of the three minesweepers proceeded on schedule, all the events triggering payment would have occurred during Stephens Brothers' fiscal year ending October 31, 1959. As a result of certain complications that caused delays, Stephens Brothers adopted the modified completed contract method of reporting its income under the minesweeper contract. The Commissioner does not question Stephens Brothers' use of that method of reporting income and expenses on the contract. His two objections to the tax treatment of the income from the Navy contract are as follows:

1. *The one percent reserve for final settlement.*

The Commissioner asserts, and the Tax Court concluded, that Stephens

Brothers erred in failing to include the one percent retained by the Navy pending final settlement in its income for the year 1960. The amount of that one percent reserve is $53,987.70. (The taxpayer stipulated that the $6,000 retained by the Navy from the two percent performance reserve on MSC 281 should have been included in its income for its final fiscal year.)

The taxpayer maintains here, as it did in the Tax Court, that because the amount of that payment had not been determined as of the end of Stephens Brothers' final fiscal year, it was too contingent to be includable. It argues that differences concerning the amount of the adjustments for changes in the costs of labor and materials were "hotly contested for 3 years after October, 1960, and involved in this and other disputed claims was over $200,000.00, which Stephens finally compromised for $145,992.72." It further argues that the meaningless figure of $53,987.70 was "merely the amount that *would* have ultimately been payable after choice of index and cost audit *if* the relevant labor and material indices, over the entire period of the contract had, miraculously, exactly equalled the index for the basic month—February, 1957." It could have turned out, the taxpayer asserts, that it was entitled to far less than the $53,987.70.

The Tax Court dwells at some length on the negotiations between Stephens Marine, successor to Stephens Brothers, and the Navy over the amount of the adjustment for changes in labor and materials costs. Based on a preliminary determination under the Special Provisions of the contract, the Navy authorized and paid Stephens Brothers, on January 27, 1960, $57,539.33 for increased labor costs. (This is quite independent of the one percent reserve which was still retained by the Navy.) This determination was based on data submitted by Stephens Brothers in its final fiscal year. On October 21, 1960, after liquidation, Stephens Marine put in a claim for $116,095.86, including the early pay-

ment, in increased labor costs. After further negotiations, during which a dispute developed over whether a Pacific Area or National Index should be used, this claim was reduced slightly in 1962. On January 3, 1964, the parties agreed to substitute Stephens Brothers' actual increase in labor costs, $91,443.21. In addition, the parties agreed to a decrease of $10,409.55 in the cost of materials. At the same time, they settled a continuing dispute over an adjustment for a change order at no change in the contract price. This was a net increase of $81,033.66 in the contract price for Stephens Marine. Deducting the interim payment of $57,539.33 this left a balance due of $23,494.33, which was paid at the time of final settlement, May 15, 1964. Two other unrelated claims were paid by the Navy upon presentation in 1961 and 1962. Another claim, for relief under Public Law 85–804, was made an exception to the general release executed by Stephens Marine at the time of final settlement, and negotiations continued until 1966. Certain claims relating to permits, and arising outside the minesweeper contract were pending at the time of final settlement. During all the period of this dispute, the only claim of the Navy against Stephens Brothers or Stephens Marine was for the $10,409.55 decrease in materials costs noted above.

The Tax Court, in its "Ultimate Findings of Fact" found:

"1. As of October 4, 1960, Stephens Brothers had a fixed and enforceable right to receive a reasonably ascertainable amount, namely the $59,987.70 [the one percent final settlement reserve retained by the Navy on all three vessels plus the $6,000 retained by the Navy from the performance reserve on MSC 281 which taxpayer has stipulated should have been included] withheld by the Navy, under Contract No. 3931 until final settlement. There was a fixed right to the $59,987.70 because as of October 4, 1960, there was no contingency existing, or reasonable uncertainty, as to the ultimate payment of the $59,987.70;

therefore, the $59,987.70 should have been included in income of Stephens Brothers for its fiscal year ended October 4, 1960.

"2. The theoretical possibility of a downward adjustment of the contract price which could offset the amount retained by the Navy until final settlement, which existed by virtue of the contract provisions, did not create a contingency, or reasonable uncertainty, as to the ultimate payment of the $59,987.70.

"3. The provision for substituting a new index to compute labor cost adjustments, in place of the index provided for in the contract, did not make the ultimate payment of the $59,987.70 contingent or reasonably uncertain. The requirement that Stephens Brothers, or its successor, should execute a release of all claims, and the requirement that all claims under the contract must be settled before the Navy would pay the $59,987.70, did not make the ultimate payment of that amount contingent or reasonably uncertain, as of October 4, 1960.

"4. Petitioner has introduced no evidence to sustain a finding that there was, in fact, a contingency or a reasonable uncertainty as to the ultimate payment of the $59,987.70 as of October 4, 1960.

"5. All efforts and costs expended in the actual, physical construction of the three minesweepers were expended only by Stephens Brothers, and the $59,987.70 retained by the Navy, and ultimately paid on May 15, 1964, was earned by Stephens Brothers prior to its liquidation, and was not earned by Stephens Marine."

■ The taxpayer's modified completed contract method of accounting is essentially an accrual method of accounting. Jud Plumbing & Heating, Inc. v. Commissioner of Internal Revenue, 1945, 5 T.C. 127, aff'd in part, 5 Cir., 1946, 153 F.2d 681. An accrual basis taxpayer must report income when he acquires a fixed right to receive a reason-ably ascertainable amount. Continental Tie & Lumber Co. v. United States, 1932, 286 U.S. 290, 52 S.Ct. 529, 76 L. Ed. 1111; Food Machinery & Chemical Corp. v. Commissioner of Internal Revenue, Ct.Cl., 1960, 286 F.2d 177, cert. denied 368 U.S. 918, 82 S.Ct. 238, 7 L.Ed. 2d 134. As the Supreme Court said in Spring City Foundry Co. v. Commissioner of Internal Revenue, 1934, 292 U.S. 182, 184–185, 54 S.Ct. 644, 645, 78 L.Ed. 1200:

"Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount of gross income. When the right to receive an amount becomes fixed, the right accrues."

See also Schlude v. Commissioner of Internal Revenue, 1963, 372 U.S. 128, 137, 83 S.Ct. 601, 9 L.Ed.2d 633; H. Liebes & Co. v. Commissioner of Internal Revenue, 9 Cir., 1937, 90 F.2d 932, 937.

An exception to this rule is stated in Georgia Schoolbook Depository, Inc. v. Commissioner of Internal Revenue, 1943, 1 T.C. 463 (citations omitted):

"Where there is a contingency that may preclude ultimate payment, whether it be that the right itself is in litigation or that the debtor is insolvent, the right need not be accrued when it arises * * *. The taxpayer need not accrue a debt if later experience, available at the time that the question is adjudged, confirms a belief reasonably held at the time the debt was due, that it will never be paid. On the other hand, it must not be forgotten that the alleviating principle of 'reasonable expectancy' is after all, an exception, and the exception must not be allowed to swallow up the fundamental rule upon which it is engrafted requiring a taxpayer on the accrual basis to accrue his obligations. If this were so, the taxpayer might at his own will drift the receipt of income from one year to another, as should suit his fancy. To allow the

exception there must be a definite showing that an unresolved and allegedly intervening right makes receipt contingent, * * *. Postponement of payment without such accompanying doubts is not enough." (1 T.C. at 469.)

In Irwin v. Commissioner of Internal Revenue, 1955, 24 T.C. 722, 727, the Tax Court said (citations omitted), speaking of the completed contract method of accounting:

"Such method of accounting contemplated proper accrual of all unpaid billings, accounts receivable, and accounts payable in the year the contract is substantially completed, which in the instant case is 1938. The only exception to the rule requiring the accrual of outstanding items in the year of completion is made in the case of outstanding items which are 'contingent and uncertain.'"

See also Commissioner of Internal Revenue v. Hansen, 1959, 360 U.S. 446, 464, 79 S.Ct. 1270, 3 L.Ed.2d 1360; Food Machinery & Chemical Corp. v. Commissioner of Internal Revenue, *supra;* Commissioner of Internal Revenue v. Henry Hess Co., 9 Cir., 1954, 210 F.2d 553.

The Tax Court found that at the end of Stephens Brothers' final fiscal year there was nothing to indicate that the theoretical possibility of a downward adjustment for combined labor and materials costs would become a reality. All indications were to the contrary. That finding is well supported by the record. Thus there was no uncertainty or contingency sufficient to bring the taxpayer within the exception to the rule requiring accrual. At the end of its final fiscal year, it was practically certain that Stephens Brothers would receive the $53,987.70 in question.

2. *The interim payment for increased labor costs.*

■ In January, 1960, Stephens Brothers received from the Navy a preliminary payment of $57,539.33 on its claim for increased labor costs under the Special Provisions of the contract. That sum was included by Stephens Brothers as income on its tax return for its final fiscal year. The taxpayer now claims that it erred in including it.

Stephens Brothers deposited the sum in its general bank account; there were no restrictions on its use of the money. It was theoretically possible that Stephens Brothers would be required to refund the $57,539.33 or some part of it if a later audit and final determination of its rights under the adjustment provisions revealed that it had received more than it was entitled to. That did not come to pass, however, nor is there any indication in the record that the Navy ever took the position that any part of the payment should be refunded. Stephens Brothers, as we have noted above, ultimately received considerably more than the interim payment, although less than it had claimed.

The Tax Court found:

"The $57,539.33 authorized and paid by the Navy to Stephens Brothers, on or about January 27, 1960, during Stephens Brothers' final fiscal year, ended October 4, 1960, was not a loan, or a conditional advance in the nature of a loan. The payment of $57,539.33 was made as the result of a preliminary determination that Stephens Brothers was entitled to that amount, based on data submitted by Stephens Brothers of increased labor costs incurred in the construction of the three minesweepers."

That finding is fully supported by the record.

The so-called "claim of right doctrine" seems clearly to cover this case. See North American Oil Consolidated v. Burnet, 1932, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197; Healy v. Commissioner of Internal Revenue, 1953, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007; United States v. Lewis, 1951, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560; Brown v. Helvering, 1934, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725.

We agree with the Tax Court that Stephens Brothers received the interim payment under a claim of right and properly reported the amount as income in its final fiscal year.

### B. *The pleasure boat contracts.*

On October 4, 1960, Stephens Brothers was in the process of constructing five pleasure boats for specific private customers. During the fiscal year ending October 4, 1960, Stephens Brothers had received advance payments on the boats totalling $135,767 and had expended $84,560 on labor and material costs for the boats. In its final return Stephens Brothers reported no income from these payments, nor did it deduct as expenses any of the labor and material costs. The Commissioner assessed a deficiency based on an accrued percentage of profit earned on the five boats during the final fiscal year in the amount of $37,735. This figure was subsequently reduced by stipulation to $32,972. Under its normal accounting procedure Stephens Brothers would not have reported any income or deducted any expense for the boats until the tax year in which they were completed. The Commissioner determined that this method of accounting did not accurately reflect the income earned by Stephens Brothers during its final fiscal year and substituted a "percentage of completion" accounting method in determining the deficiency. The Commissioner created a ratio of costs as of October 4, 1960 to total cost of construction of the boats and applied this ratio to the total profit (the difference between the final sales price and final costs) to determine the amount of profit accrued to Stephens Brothers as of October 4, 1960.

Section 446(b) of the Internal Revenue Code (26 U.S.C. § 446) provides that if the method of accounting used by the taxpayer "does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income." Under this section [1] the Commissioner has broad power to require revision of an accounting method which does not clearly reflect income, Travis v. Commissioner of Internal Revenue, 6 Cir., 1969, 406 F.2d 987, 991. The Commissioner's selection of an accounting method may be challenged only by a clear showing of abuse of discretion, Wilkinson-Beane v. Commissioner of Internal Revenue, 1 Cir., 1970, 420 F.2d 352.

Although the system of accounting utilized by Stephens Brothers may have been perfectly accurate in reflecting the income of an on-going business over the years, when routine was broken by liquidation the Commissioner was empowered to substitute a form of accounting that more accurately reflected income in its final year. In United States v. Lynch, 9 Cir., 1951, 192 F.2d 718, a corporation had followed the practice of not reporting receipts from storage income until the stored items were withdrawn and the storage bill paid. At liquidation the corporation in its final return did not report storage income for goods which had been stored for a period of months but had not yet been removed. The Commissioner held that the storage charges should be accrued to the date of liquidation and reported as income. This court held that the Commissioner had acted within his discretion under 26 U.S.C. § 446 (then 26 U.S.C. § 41). We said:

"Acceptance of the corporation's accounting method in prior years did not prevent the Commissioner from later exercising his statutory power within proper limits. The fundamental change in the corporation's circum-

1. Taxpayer argues that the case is governed by Internal Revenue Code § 336 (26 U.S. C. § 336). That section provides that "no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation." We agree with the government that this section has no bearing on whether or not Stephens Brothers incurred taxable income during its final fiscal year from advance payments made on the five boat contracts.

stances, that is, its liquidation and consequent non-existence, prevented its accounting technique from achieving the rough matching of expenses and income previously attained." (192 F.2d at 721.)

See also Jud Plumbing & Heating v. Commissioner of Internal Revenue, 5 Cir., 1946, 153 F.2d 681; Standard Paving Co. v. Commissioner of Internal Revenue, 10 Cir., 1951, 190 F.2d 330.

The taxpayer argues that these cases are inapposite because Stephens Brothers utilized the accrual method of accounting rather that the completed contract method. It contends that under the accrual method income is not included until earned and under the contract the income was not earned until the boats were completed. We need not concern ourselves with the possible outcome had taxpayer been using the accrual method, for we are convinced that the Tax Court's determination that taxpayer was actually using a completed contract method of accounting was not clearly erroneous.

Stephens Brothers deferred reporting the income and expenses on each contract until that contract was completed, a method different from that used in connection with the minesweeper contracts. The contract used by Stephens Brothers when undertaking the construction of a pleasure craft also differed from the minesweeper contracts. It provided that title to the boat would remain in Stephens Brothers until the entire contract price had been paid. Payments on the contract price were required at stated intervals. Thus, generally twenty-five percent of the price was due when the contract was signed; an additional twenty-five percent was due when the hull was planked; an additional twenty-five percent was due when the engine was installed; the final twenty-five percent was due upon completion of the boat. In the event of default by the customer all payments were forfeited to Stephens Brothers. These payments were denominated "advance payments" in the pretrial stipulation. Ste-

phens Brothers was not required to apply them to labor and materials used under the contract; they were not segregated, but were deposited in its general bank account. Thus Stephens Brothers' failure to report any of these payments as income was more commensurate with the completed contract method of accounting than the accrual method.

The appellant argues that even if the Tax Court was correct in upholding the Commissioner's finding of a deficiency, it erred in its determination of the amount of that deficiency. The method utilized by the Commissioner was essentially the same as that used in *Jud Plumbing, supra,* and we find no fault with it.

■ The taxpayer also contends that hull 46 should have been treated as one being constructed for inventory and not as a specific contract for a private party. That hull was being constructed under a contract with Curtiss-Wright Corporation. Curtiss-Wright was to supply the engines. When it was determined that the engines would not be feasible, Curtiss-Wright requested release from the contract. At the time of liquidation Stephens Brothers had the right to keep the Curtiss-Wright advance payments under the terms of the contract. After the liquidation the successor corporation made the decision to refund a portion of the advance payments to Curtiss-Wright. The boat was subsequently sold to another private party. Under these circumstances, the Commissioner was not unreasonable in including those payments in his estimate of Stephens Brothers income during the final fiscal year.

■ With regard to hull 61, the taxpayer argues that although it credited the purchaser with $22,955 for a trade-in allowance, when the trade-in boat was sold it brought only $17,000. Thus it argues that the final price should have been $5,955 less than the $55,968 used by the Commissioner. Taxpayer stipulated that the final sales price was $55,968. When the Commissioner is estimating the value of an uncompleted contract,

he can only make an approximation based on the available evidence. The Tax Court was not clearly erroneous in upholding the Commissioner's determination.

Finally, the taxpayer argues that the Commissioner should not be allowed to apply a new accounting method in a *"de minimis"* situation. It argues that since Stephens Brothers had gross income of $6,000,000 in its final fiscal year, it is absurd to apply a new method of accounting merely to augment this income by $32,000. We need only note that on the tax return in question Stephens Brothers reported taxable income of only $40,237.41. In light of this fact a determination which increases *taxable* income by $32,000 can hardly be deemed *de minimis*.

Affirmed.