LOUIS S. ROTOLO AND DOROTHY R. ROTOLO, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8048-85, 8116-85, 8117-85, 8328-85, 8329-85, 8330-85, 8337-85.

Filed June 22, 1987.

---

[1]The following cases are consolidated herewith: James B. Wilson, docket No. 8116-85; Thomas J. Golab and Ivalee N. Golab, docket No. 8117-85; Louis S. Rotolo, docket No. 8328-85; James B. Wilson, docket No. 8329-85; Robert S. Ledley, docket No. 8330-85; and Thomas J. Golab, docket No. 8337-85.

*Neil S. Kurlander, James S. Eustice,*[2] and *John L. Wood,* for the petitioners.

*Cynthia J. Mattson,* for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes and the following liabilities against the petitioners as transferees of corporate assets:

| Petitioner | Taxable year | Deficiency | Liability |
|---|---|---|---|
| Louis S. Rotolo and Dorothy R. Rotolo | 1976 | $5,571 | - - - |
| James B. Wilson | 4/1/75 to 2/13/76 | - - - | $85,265 |
| Thomas J. Golab and Ivalee N. Golab | 1976 | 4,242 | - - - |
| Louis S. Rotolo | 4/1/75 to 2/13/76 | - - - | 85,265 |
| James B. Wilson | 1976 | 5,817 | - - - |
| Robert S. Ledley | 4/1/75 to 2/13/76 | - - - | 518,465 |
| Thomas J. Golab | 4/1/75 to 2/13/76 | - - - | 78,708 |

After concessions by the parties, the issues for decision are: (1) Whether a corporation is entitled to offset the cost of inventory attributable to certain incomplete contracts against advance payments on such contracts, when such contracts and such inventory are distributed to its stockholders in a complete liquidation; and (2) whether, in the circumstances of this case, stock treated as transferred by a corporation to certain of its employees was reasonable compensation for services performed.

---

[2]James S. Eustice only filed entry of appearances in docket Nos. 8328-85, 8329-85, 8330-85, and 8337-85; his name appears on the petitioners' briefs.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

At the times their petitions were filed in this case, the petitioners, Louis S. and Dorothy R. Rotolo, husband and wife, maintained their legal residence in Silver Spring, Maryland; the petitioner, James B. Wilson, maintained his legal residence in Arlington, Virginia; the petitioners, Thomas J. and Ivalee N. Golab, husband and wife, maintained their legal residence in Beltsville, Maryland; and the petitioner, Robert S. Ledley, maintained his legal residence in Silver Spring, Maryland. For the year 1976, all of the petitioners, except Mr. Wilson, filed their Federal income tax returns with the Internal Revenue Service Center in Philadelphia, Pennsylvania; Mr. Wilson filed his return with the Service Center in Memphis, Tennessee. For convenience, Thomas Golab, Robert Ledley, Louis Rotolo, and James Wilson will sometimes be referred to as the petitioners.

Dr. Robert Ledley has a master of arts degree from Columbia University and doctor of dental science degree from New York University. In the early 1950s, he was a physicist at the National Bureau of Standards where he was involved with the world's first successful digital computer. In the late 1950s, he became a professor at George Washington University, where he prepared and taught the first digital computer engineering courses in the country. In 1960, he authored the first textbook on digital computer engineering. From 1960 through the years in issue, he was president of the National Biomedical Research Foundation (NBRF). In 1970, he joined the faculty of Georgetown University. In addition, from the 1950s to the years in issue, he held numerous positions in the fields of medicine and computer technology. Dr. Ledley has authored more than 200 books and periodicals, primarily dealing with the application of computer technology to medicine. At the time of trial, in addition to his other activities, he was the editor-in-chief of four journals: Computerized Tomography, Computers in Biology and Medicine, Journal of Computer Languages, and Journal of the Pattern Recognition Society.

Louis Rotolo has a bachelor of science degree in electrical engineering from the University of Michigan and a master's

degree in engineering from George Washington University. In the early 1950s, he was a project engineer in the U.S. Navy and was responsible for the design and procurement of electrical shipboard systems. In the late 1950s, he was a senior research scientist and lecturer at George Washington University, where his research dealt with digital computers. From 1961 through the years in issue, he was a senior research scientist and the treasurer at NBRF. From 1970 through the years in issue, he was on the faculty of Georgetown University. In addition, Mr. Rotolo has held faculty positions in the fields of computer science and engineering. Mr. Rotolo has authored approximately 41 articles dealing with computers, computer logic design, and the application of computers to medical problems.

Thomas Golab has a bachelor's degree in electrical engineering and a master of science degree in engineering from George Washington University. From 1961 to 1963, he was an electronics engineer for the U.S. Navy working on passive sonar systems. During the 1960s, he was an engineer for several private corporations developing radar and "anti-jam" communications systems. From 1968 through the years in issue, he was a senior research scientist at NBRF. He has authored six articles on the use of computers in medicine.

James Wilson has a bachelor's degree in electrical engineering from George Washington University and has taken graduate courses in math and computer science. In the late 1950s, he worked with Dr. Ledley as a research associate at George Washington University. Since 1960, he has been a senior research scientist and the secretary at NBRF.

In 1960, Dr. Ledley and Mr. Wilson formed NBRF, an organization described in section 501(c)(3) of the Internal Revenue Code of 1954,[3] and exempt from Federal income tax. NBRF was devoted to research in the area of computer applications in medicine and was primarily funded by Federal grants, including grants from the National Institutes of Health. In 1970, NBRF became affiliated with Georgetown University.

---

[3] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.

In early 1973, representatives of Georgetown University asked Dr. Ledley if NBRF could build a computerized timograph (CT) scanner, for less than the price charged by the then current manufacturer, EMI. A CT scanner is a diagnostic machine which produces images of an internal part of the body without requiring an injection of dye or surgery. The EMI scanner could only make images of a patient's head and required a water interface between the patient and the machine. Dr. Ledley determined that NBRF could build a better machine, called the Automatic Computerized Transverse Axial Scanner, or the ACTA scanner, for less than the cost of the EMI scanner. The ACTA scanner did not require a water interface and could scan every part of a patient's body; the images created by it had four times the resolution of those provided by the EMI scanner. Most of the modern CT scanners are based on the ACTA scanner.

The first ACTA scanner was primarily designed by Dr. Ledley and was built by NBRF, with Mr. Golab in charge of electronics, Mr. Rotolo as industrial coordinator, and Mr. Wilson in charge of computer software. Georgetown University purchased the prototype from NBRF for approximately $300,000. This prototype was installed at Georgetown University Hospital, where it was placed in clinical operation in February 1974. The prototype attracted a tremendous amount of attention; its effect on medical diagnostic techniques was almost equivalent to that caused by the development of the X-ray tube. Most of the chiefs of hospital radiology departments in this country, and many from around the world, went to Georgetown to see the ACTA scanner.

In early 1974, while the prototype was in full clinical operation and radiologists from around the world were observing its operation, Georgetown University, NBRF, and the petitioners decided to manufacture commercially the ACTA scanner. Digital Information Service Corp. (Digital) was the organization chosen to manufacture the ACTA scanners. Digital was formed in 1971 by Dr. Ledley to produce commercially the AZOR, a machine that was used for evaluating the efficacy of antibiotic drugs. Messrs. Golab, Rotolo, and Wilson, and Gerald Pence were employed by Digital to manufacture the AZOR, and were employed by

Digital at the time the decision was made to manufacture commercially the ACTA scanner. Mr. Pence was also an employee of NBRF, who had worked on the development of the ACTA scanner. He left Digital before the beginning of the commercial success of the ACTA scanner. Dr. Ledley was the president of Digital, Mr. Rotolo was its treasurer, and Mr. Wilson was the secretary.

Beginning in the spring of 1974, the employees of Digital, principally the petitioners, concentrated their efforts on making the ACTA scanner commercially viable. Many parts had to be re-engineered so that the machine would be easier to service, more reliable, easier to install, and easier to manufacture. Much of the ingenuity which had resulted in the construction of the prototype, a uniquely constructed machine, had to be transferred into components which could be produced in larger quantities and which were standardized for all ACTA scanners. In performing their ACTA-related duties for Digital, Messrs. Golab, Rotolo, and Wilson worked a substantial number of hours, including work during evenings, weekends, and holidays. Mr. Golab was the chief engineer; he supervised the actual manufacturing of the machines and was responsible for modifications that made the machines more reliable. Mr. Rotolo was primarily responsible for ordering components, plant management, outside contracts, and employee relations. Mr. Wilson was responsible for the computer program upon which the entire machine depended. Mr. Wilson's work led to a patent for a system devised by him to improve image definition on the ACTA scanner. The services of all three men were essential to Digital. In August 1974, recognizing the unique qualifications of Messrs. Golab, Pence, Rotolo, and Wilson, the tremendous amount of work involved in manufacturing the ACTA scanner, and the potential for lucrative offers from other radiology companies, Dr. Ledley offered each of these men remuneration in "six figures" if the ACTA scanner was a success. Dr. Ledley's offers were never reduced to writing.

On July 1, 1974, Digital received an exclusive license to manufacture the ACTA scanner from NBRF. In return, NBRF received a 2-percent royalty from net sales and $30,000 per machine. Between July 1974 and August 1975, Digital entered into 17 contracts for the sale of an ACTA scanner.

Digital also entered into maintenance contracts with 15 of the purchasers.

A typical contract for the sale of an ACTA scanner required Digital to provide an ACTA scanner which was substantially the same as the prototype at Georgetown University. The purchaser had to provide a site for the installation of the ACTA scanner, and Digital was to review and approve such site. Under the terms of the contract, Digital assembled and installed the ACTA scanner and provided training for certain personnel. Digital warranted the ACTA scanner for 90 days after installation was complete and agreed to provide any parts and labor necessary to keep it in satisfactory working condition during that time. In addition, a maintenance contract, which began on the 91st day after installation was complete, was available.

The sales contracts called for a deposit from the purchaser before Digital would begin work on a unit. In general, the balance of the purchase price was due when the unit was installed to the satisfaction of the purchaser. On certain contracts, progress payments were required. In a sample sales contract admitted into evidence, the total price was $271,500: $224,500 for the ACTA scanner, $20,000 for a nine-track tape system and a "2400 foot tape," and $27,000 for a maintenance agreement of 1 year in duration. A deposit of $50,000 was required upon execution of the contract, partial payments were due upon the delivery of major components of the ACTA scanner at the installation site, and the balance was payable when installation was completed.

Although Digital was the first company in the world to market a whole-body CT scanner, other substantially larger companies with greater financial capabilities began to compete with Digital. In addition, Digital experienced difficulty in meeting the terms of its contracts because its technical staff was quite small, and it did not have the financial capability to hire additional engineers and technicians.

In early 1975, Pfizer, Inc. (Pfizer),[4] approached Digital

---

[4]For convenience, "Pfizer" will refer to Pfizer, Inc., and all corporations related to Pfizer, Inc.

and proposed a contractual arrangement pursuant to which Pfizer would assist in completing Digital's existing contracts and assume all maintenance obligations. As a part of such contractual arrangements, Pfizer agreed to provide substantial financial support for research at Georgetown University in exchange for the transfer by Georgetown University of its scanner patent rights to Pfizer.

On September 11, 1975, a stock issuance and redemption agreement was executed; it provided in part:

> WHEREAS, Employees [Messrs. Golab, Rotolo, and Wilson] are valued employees of Corporation [Digital] and National Biomedical Research Foundation ("Foundation") and Ledley wishes to permit Employees to purchase stock in Corporation in order to provide them with an incentive for their continued performance of faithful services on behalf of Corporation and Foundation * * *

Dr. Ledley owned all of the Digital stock before the execution of such agreement. Pursuant to such agreement, 60 shares were transferred to Mr. Golab, 65 shares to Mr. Rotolo, and 65 shares to Mr. Wilson; Dr. Ledley retained 810 shares. In addition, Messrs. Golab, Rotolo, and Wilson purchased their shares for $1 per share. Dr. Ledley was given a proxy to vote the shares on behalf of Messrs. Golab, Rotolo, and Wilson for 2 years, and these three were prohibited from selling the stock without the prior consent of Dr. Ledley while they remained employed by Digital.

On September 18, 1975, Pfizer and Digital entered into a subcontracting agreement whereby Pfizer agreed to complete the remaining ACTA scanner sales contracts and to perform the 15 maintenance contracts entered into by Digital. Digital agreed to cooperate and assist Pfizer in the completion of the contracts, including making Dr. Ledley and Messrs. Golab, Rotolo, and Wilson available to consult with Pfizer, subject to limitations "imposed by Georgetown University on outside work performed by members of its faculty." In return, Digital agreed to pay Pfizer $110,000 for completion of the ACTA sales contracts and $27,000 for each of the maintenance contracts. In addition, Digital agreed to supply or pay Pfizer for the parts necessary to perform the sales contracts.

On September 18, 1975, Digital and NBRF entered into a recision agreement with respect to Digital's exclusive li-

cense to manufacture the ACTA scanner. NBRF then transferred its patent rights in the ACTA scanner to Georgetown University. On the same day, Georgetown University and Pfizer entered into a research agreement whereby Georgetown University granted to Pfizer the exclusive right and license to manufacture, use, and sell the ACTA scanner throughout the world. In return, Pfizer agreed to pay Georgetown University $600,000 per year for the first 2 years of the agreement, the lesser of $600,000 or 4.5 percent of ACTA scanner net sales revenue (including rental revenue) for each of the third through the 10th years, and the lesser of $600,000 or 4.5 percent of the ACTA scanner gross rental income for each year after the 10th year. The payments from Pfizer were intended to support research projects at Georgetown University in the area of the application of computers and computer-related technology to medicine.

As of September 18, 1975, 8 of the 17 contracts had been completed by Digital (the completed contracts). One of the incomplete contracts was 90-percent complete. Inventory for the remaining 8 incomplete contracts was on hand, but no other work had been performed on such contracts.

On September 18, 1975, Digital paid bonuses to six of its employees, including Messrs. Golab, Rotolo, and Wilson. Such bonuses were declared on August 29, 1975, when Dr. Ledley executed the "consent action of sole stockholder." Such consent action stated that "The bonuses set forth hereinabove represent fair additional compensation for the many overtime hours, Saturdays and Sundays of work given by these employees over the past two years."

On September 18, 1975, a partnership agreement was executed to form Residual Organization (Residual). Such agreement recites that the parties thereto are stockholders in Digital who wish to liquidate Digital and "carry on in partnership form the business activities presently conducted by" Digital. In addition, the agreement states:

This Partnership will engage in the business of supervising the manufacture, assembly, installation, testing and maintenance of ACTA scanners and related machinery subject to the terms and conditions of a Subcontracting Agreement between DISCO [Digital] and Pfizer Medical Systems, Inc., which Agreement has been assigned to this Partnership. In conducting this business the Partnership shall utilize the business assets, including inventory, previously owned by DISCO. These business

assets will either be purchased by the Partnership from DISCO or will be distributed in liquidation of DISCO to the Partnership as assignee of the shareholders of DISCO. The Partnership shall not engage in any other business activities without the prior consent of all partners.

Residual was to exist for 5 years, unless dissolved earlier. Dr. Ledley was named as the managing partner, and each of the petitioners received the same percentage interest in Residual as he owned in Digital. The partnership agreement contained a paragraph setting forth restrictions on the transfer of interests in Residual; no partner could transfer his interest without the prior written consent of all the other partners.

On September 18, 1975, Digital adopted a plan of complete liquidation pursuant to section 337. Pursuant to the plan, Digital was to cease all business activities and remain in existence solely to collect amounts owed to it, to pay its liabilities, and to distribute to its stockholders in liquidation the assets of the corporation. The stockholders of Digital, the petitioners, appointed Residual as their assignee to receive the assets and assume the liabilities distributed. Pfizer purchased all of the assets of Digital except those distributed to Residual. Pfizer hired the employees of Digital and took over the Digital manufacturing facility.

Both Pfizer and Georgetown University expected Digital to be liquidated. Pfizer did not want Digital to compete with it, and Georgetown University did not want the petitioners to engage in a substantial amount of outside employment. In addition, in deciding to liquidate Digital and form Residual, Dr. Ledley followed the advice of his attorney and his accountant. Pursuant to the plan of liquidation, Digital's nine incomplete contracts, the inventory necessary to complete such contracts (valued at $854,068), Digital's rights under the subcontracting agreement with Pfizer, and certain other assets of Digital were distributed in liquidation to Residual on September 18, 1975. The inventory consisted mostly of very large components, some of which were delivered directly to customers, some of which had not been delivered, and some of which were at the manufacturing facility that Pfizer took over.

Digital elected to compute its income by using the completed contract method of accounting and to defer the reporting of the advance payments in accordance with section 1.451-5(b)(1)(ii), Income Tax Regs. Advance payments were those payments received by Digital in the taxable year on contracts not completed in the taxable year. On its Federal income tax return for its taxable year ending March 31, 1975 (the 1975 taxable year), Digital reported yearend inventory of $966,552, deferred $1,500,675 of advance payments, and reported a net operating loss of $66,989. During such taxable year, Digital did not complete any ACTA scanner contracts. For the taxable year ending February 13, 1976 (the 1976 taxable year), Digital reported gross receipts of $2,367,682 based on the following information:

| | |
|---|---|
| Advance payments received in prior year.................... | $1,500,675 |
| Advance payments received in current year ................. | 1,137,200 |
| Total advance payments received ......................... | 2,637,875 |
| Less: Inventory at end of year........................... | 854,068 |
| Total advance payments included in gross receipts........... | 1,783,807 |
| Completion payments received in current year and included in gross receipts ..................................... | 583,875 |
| Total payments less yearend inventory included in gross receipts ............................................. | 2,367,682 |

In addition, Digital reported $1,694,343 as the cost of goods sold, calculated as follows:

| | |
|---|---|
| Inventory at beginning of year............................ | $966,552 |
| Inventory costs incurred through 2/13/76 ................. | 1,581,859 |
| Total ................................................ | 2,548,411 |
| Less: Inventory at end of year .......................... | 854,068 |
| Cost of goods sold .................................... | 1,694,343 |

Thus, for its 1976 taxable year, Digital reported $673,339 as gross profit (i.e., $2,367,682 − $1,694,343).

On February 13, 1976, Digital made its final assignment in liquidation to Residual as assignee of the stockholders. Pursuant to the liquidation, Digital treated the following as distributions to its stockholders:

| | |
|---|---|
| Cash.................................................. | $149,676 |
| Inventory ............................................. | 854,068 |
| Contract value ........................................ | 204,022 |
| Treasury bills ......................................... | 99,413 |

```
Accounts receivable .....................................    $35,487
Liabilities...........................................      – 30,883
Total ...............................................     1,311,783
```

The contract value was determined as follows:

```
Unbilled contract income............................        $1,213,300
Less:  Inventory cost ........................  $854,068
       Subcontract cost........................   110,000
       Royalties .............................    45,210    1,009,278
Total ...............................................        204,022
```

The distributions to the stockholders for 1975 and 1976 were made on the basis of each stockholder's percentage ownership interest in Digital. Mr. Golab, who owned 6 percent of the Digital shares, received a total of $78,708: $68,286 for 1975 and $10,422 for 1976. Dr. Ledley, who owned 81 percent of the shares, received a total of $1,062,545: $921,854 for 1975 and $140,691 for 1976. Messrs. Rotolo and Wilson, who each owned 6.5 percent of the shares, each received a total of $85,265: $73,975 for 1975 and $11,290 for 1976.

Digital valued the stock received by Messrs. Golab, Rotolo, and Wilson by reference to the amounts distributed to them, totaling $249,000.[5] Digital deducted that amount as compensation to officers (Messrs. Rotolo and Wilson) or salaries and wages (Mr. Golab).

From the contracts assigned to it, Residual, which used the accrual method of accounting, reported gross receipts of $763,191 for its taxable year ending December 31, 1975, and $508,825 for its taxable year ending December 31, 1976. For 1975 and 1976, the amount of Residual's cost of goods sold was calculated as follows:

|  | 1975 | 1976 |
|---|---|---|
| Inventory at beginning of year | - - - | $409,550 |
| Assigned inventory | $854,068 | - - - |
| Purchases | - - - | 2,600 |
| Subcontract labor and other costs | 303,282 | 57,816 |
| Total | 1,157,350 | 469,966 |
| Less: Inventory at end of year | 409,550 | - - - |
| Cost of goods sold | 747,800 | 469,966 |

---

[5]The actual sum of such distributions is $249,238.

Thus, Residual reported gross profits of $15,391 for 1975 (i.e., $763,191 – $747,800) and $38,859 for 1976 (i.e., $508,825 – $469,966).

Mr. Golab earned wages of approximately $21,500 from NBRF in 1973, $23,000 from NBRF in 1974, $17,160 from NBRF in 1975, and $28,022 from Georgetown University in 1976. Approximately $5,500 of his wage from NBRF in 1975 was payment for accrued annual leave. Mr. Golab's salary from Digital was approximately $4,300 in 1974 and $18,878 in 1975. In addition, on September 18, 1975, Mr. Golab was paid a $40,000 bonus by Digital.

Mr. Rotolo earned wages of approximately $30,000 from NBRF in 1973, slightly more than $30,000 from NBRF in 1974, $24,274 from NBRF in 1975, $6,611 from Georgetown University in 1975, and $35,899 from Georgetown University in 1976. Mr. Rotolo's salary from Digital was approximately $5,000 in 1974 and $15,655 in 1975. In addition, on September 18, 1975, Mr. Rotolo was paid a $35,000 bonus by Digital.

Mr. Wilson earned wages of approximately $23,500 from NBRF in 1974, $24,169 from NBRF in 1975, $7,901 from NBRF in 1976, and $19,939 from Georgetown University in 1976. Mr. Wilson's salary from Digital was approximately $4,500 in 1974 and $8,781 in 1975. In addition, on September 18, 1975, Mr. Wilson was paid a $35,000 bonus by Digital.

Mr. Golab included $137,586 as compensation from Digital on his Federal income tax return for 1975 and reported a short-term capital gain of $76 for 1976 on $10,422 of the liquidation distribution from Digital. Mr. Rotolo included $135,920 as compensation from Digital on his return for 1975 and reported a short-term capital gain of $81 for 1976 on $11,290 of the liquidation distribution from Digital. Mr. Wilson included $129,046 as compensation from Digital on his return for 1975 and reported a short-term capital gain of $81 for 1976 on $11,290 of the liquidation distribution from Digital.

On February 26, 1979, the petitioners executed transferee agreements whereby the petitioners agreed to pay the amount of any Federal income tax finally determined to be payable by Digital for its 1976 taxable year.

In his notices of liability issued to the petitioners as transferees of Digital, the Commissioner determined that Digital, on its tax return for its 1976 taxable year, was not entitled to deduct the cost of inventory distributed by it to Residual and that Digital had failed to establish that the deduction for the value of the stock transferred to Messrs. Golab, Rotolo, and Wilson was allowable. In his notices of deficiency issued to Messrs. Golab, Rotolo, and Wilson, the Commissioner determined that, for 1976, among other things, they had failed to substantiate a basis in the Digital stock and, therefore, that they had greater capital gain than reported on their income tax returns for 1976. The claimed deficiencies have since been conceded by the Commissioner.

## OPINION

The first issue for decision is whether, upon its liquidation, Digital was entitled to offset the cost of its inventory attributable to the incomplete ACTA scanner contracts against the advance payments on such contracts, when such contracts and such inventory were distributed to Digital's stockholders in a complete liquidation.

Section 446 provides that taxable income shall be computed under the method of accounting regularly used by the taxpayer in computing his income and keeping his books, but if no method has been regularly used by the taxpayer or if "the method used does not clearly reflect income," the computation shall be made under such method as, in the opinion of the Commissioner, does clearly reflect income. Sec. 446(b). In general, a method of accounting clearly reflects income when it results in taxable income being reported with as much accuracy as recognized methods of accounting permit. See *Electric & Neon, Inc. v. Commissioner*, 56 T.C. 1324, 1333 (1971), and the cases cited therein, affd. without published opinion 496 F.2d 876 (5th Cir. 1974). The term "method of accounting" includes not only the taxpayer's overall method but also the accounting treatment of any item. Sec. 1.446-1(a)(1), Income Tax Regs.

Section 446 vests the Commissioner with wide discretion in determining whether a particular method of accounting clearly reflects income, and a heavy burden is imposed upon the taxpayer to overcome a determination by the Commis-

sioner in this area. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532 (1979); *United States v. Catto*, 384 U.S. 102, 114 (1966); *Commissioner v. Hansen*, 360 U.S. 446, 467 (1959); *Lucas v. Structural Steel Co.*, 281 U.S. 264, 271 (1930). In the case of taxpayers who are operating on a completed contract method of accounting, and who pass those contracts to their stockholders in liquidation, the Commissioner may exercise the discretion granted by section 446 to place those taxpayers on a percentage of completion method of accounting to insure that profits earned by the corporation prior to liquidation are taxed to it. *Standard Paving Co. v. Commissioner*, 190 F.2d 330 (10th Cir. 1951), affg. 13 T.C. 425 (1949); *Jud Plumbing & Heating, Inc. v. Commissioner*, 153 F.2d 681 (5th Cir. 1946), affg. 5 T.C. 127 (1945). However, it is a well-established principle that the Commissioner cannot require a taxpayer to change from an accounting method which clearly reflects income because the Commissioner considers an alternate method to more clearly reflect income. See, e.g., *St. James Sugar Co-op, Inc. v. United States*, 643 F.2d 1219 (5th Cir. 1981); *Bay State Gas Co. v. Commissioner*, 75 T.C. 410, 417 (1980), affd. 689 F.2d 1 (1st Cir. 1982); *Auburn Packing Co. v. Commissioner*, 60 T.C. 794, 798-800 (1973); *Garth v. Commissioner*, 56 T.C. 610, 618 (1971). In addition, the Commissioner may not require a taxpayer to adopt an accounting method which does not clearly reflect income. See *Brountas v. Commissioner*, 74 T.C. 1062, 1069 (1980), supplemental opinion to 73 T.C. 491 (1979), vacated and remanded on other grounds 692 F.2d 152 (1st Cir. 1982), affd. in part and revd. in part on other grounds sub nom. *CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir. 1982).

Gross income, in a manufacturing business, means total sales less cost of goods sold (the gross profit from sales), plus any income from investments and from incidental or outside operations and sources. Sec. 1.61-3(a), Income Tax Regs.; see Form 1120. "[T]he Commissioner has always recognized * * * that the cost of goods sold must be deducted from gross receipts in order to arrive at gross income." *Sullenger v. Commissioner*, 11 T.C. 1076, 1077 (1948). The cost of goods sold during a year is determined by subtracting inventory on hand at the end of the year

from the sum of the inventory on hand at the beginning of the year and the cost of purchases. See Schedule A, Form 1120. The use of inventories is a key feature of the accrual method of accounting. Inventories are intended to insure a clear reflection of the year's income by matching sales during the taxable year with the costs attributable to those sales; costs attributable to inventory remaining on hand at the end of the year are not expensed in the year incurred but are, in effect, deferred until the year in which such inventory is sold. See *Photo-Sonics, Inc. v. Commissioner*, 357 F.2d 656, 657-658 (9th Cir. 1966), affg. 42 T.C. 926 (1964); *All-Steel Equipment Inc. v. Commissioner*, 54 T.C. 1749, 1751 (1970), affd. per curiam on this issue 467 F.2d 1184 (7th Cir. 1972). Where inventories are employed, purchases and sales must be computed on the accrual method (unless another method is authorized by the Commissioner) in order to avoid the distortion of income. Sec. 1.446-1(c)(2), Income Tax Regs.; *Stoller v. United States*, 162 Ct. Cl. 839, 845, 320 F.2d 340, 343 (1963).

Section 1.446-1(c)(1)(ii), Income Tax Regs., describes the accrual method as follows:

Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Under such a method, deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy. * * *

This description of the accrual method is repeated in the regulations under section 451, insofar as it pertains to the accrual of income, and in the regulations under section 461, insofar as it pertains to the accrual of deductible expenses. This so-called "all events" test has long been recognized as a cornerstone of the accrual method of accounting for Federal income tax purposes. See, e.g., *Brown v. Helvering*, 291 U.S. 193 (1934); *Lucas v. American Code Co.*, 280 U.S. 445 (1930); *United States v. Anderson*, 269 U.S. 422 (1926).

Section 451(a) and section 1.451-1(a), Income Tax Regs., state the general rule that any item of gross income shall be included in gross income for the year in which it is received by the taxpayer, unless, under an acceptable accounting

method, it may be properly accounted for in some other period. An exception to this general rule exists for income from long-term contracts.

Section 1.451-3(b), Income Tax Regs., provides that, in general, the term "long-term contract" includes a manufacturing contract which is not completed within the taxable year in which it is entered into. However, a manufacturing contract constitutes a long-term contract only if it requires the production of items not normally carried in the finished goods inventory of the taxpayer or items which normally require more than 12 calendar months to complete. Sec. 1.451-3(b)(1)(ii), Income Tax Regs.

Income from long-term contracts may be included in gross income in accordance with either of two long-term contract methods: (1) The completed contract method, under which all income and related expenses are deferred until completion of the contract, and (2) the percentage of completion method, under which the income from a contract is reported in proportion to the percentage of the work that has been completed by the end of the taxable year. In addition, the taxpayer may report such income under any other method which clearly reflects income. Whichever method is chosen, it must generally be applied consistently to all of a taxpayer's contracts within the same trade or business. Sec. 1.451-3(a)(1), Income Tax Regs.

Under the percentage of completion method, the income for the year is that proportion of the gross contract price corresponding to the percentage of the total contract completed during the year. The determination of the percentage of completion of a contract may be made at the end of the taxable year either by comparing the costs incurred with respect to the contract with the estimated total contract costs (the costs-incurred alternative) or by comparing the work performed on the contract with the estimated total work to be performed (the work-performed alternative). Compare *Berger Engineering Co. v. Commissioner*, T.C. Memo. 1961-292, with *Dally v. Commissioner*, 20 T.C. 894 (1953), affd. 227 F.2d 724 (9th Cir. 1955). Under the percentage of completion method, all costs incurred during the year with respect to the long-term contract must be taken into account. However, materials and supplies on

hand at the end of the year but not yet in process shall not be taken into account for the year. Sec. 1.451-3(c), Income Tax Regs.

Under the completed contract method, the gross income derived from long-term contracts is reported as income for the year in which the contract is finally completed or accepted; the gross contract price of each contract is reported in gross income for the taxable year in which such contract is completed, and the cost of such contract must be accounted for in such year. Sec. 1.451-3(d), Income Tax Regs.; see also *Steele v. Commissioner*, 434 F.2d 185 (5th Cir. 1970), affg. per curiam a Memorandum Opinion of this Court; *Stephens Marine, Inc. v. Commissioner*, 430 F.2d 679 (9th Cir. 1970), affg. a Memorandum Opinion of this Court.

An advance payment is a payment which is received by a taxpayer using a long-term contract method of accounting and which is to be applied to such a contract not completed within the taxable year. Sec. 1.451-5(a), Income Tax Regs. Such payments are includable in income in the taxable year in which the gross receipts from the contract are properly includable under such method of accounting. Sec. 1.451-5(b), Income Tax Regs. However, section 1.451-5(f), Income Tax Regs., provides that if a taxpayer has adopted an acceptable method of accounting for a long-term contract, and if in a year the taxpayer ceases to exist, other than in a transaction to which section 381(a) applies, "then so much of the advance payment as was not includible in his gross income in preceding taxable years shall be included in his gross income for such taxable year."

The Commissioner maintains that Digital may not reduce its gross income from the advance payments on incomplete ACTA scanner contracts by the cost of the inventory attributable to such contracts. In support of his position, he sets forth three arguments. First, he argues that section 451 and the regulations thereunder do not allow the inventory offset. Second, he argues that the tax benefit rule is applicable, and under such rule, Digital is not allowed an offset for the costs of the inventory because that inventory was distributed to its stockholders and was includable in the bases of the stockholders. Finally, he argues that the offset does not result in a clear reflection of income and

violates the "all events" test since the inventory had not been used by the end of Digital's 1976 taxable year. The petitioners bear the burden of demonstrating that the Commissioner's determination is clearly unreasonable. *Thor Power Tool Co. v. Commissioner*, 439 U.S. at 532-533, and the cases cited therein.

The parties agree that Digital properly included the advance payments received by it in its final taxable year, but the Commissioner contends that since section 1.451-1(f), Income Tax Regs., requires that such payments be included in "gross income," an offset for the costs of inventory is not allowable. However, the Commissioner is merely drawing an inference from the regulations; the regulations contain no express provision dealing with the costs of inventory in such a situation. Moreover, it is well recognized that in the case of a manufacturing business, such as Digital, gross receipts must be reduced by cost of goods sold to find gross income. Sec. 1.61-3(a), Income Tax Regs.; see Form 1120. The advance payments received by Digital constituted gross receipts, and such gross receipts must be offset by the appropriate inventory cost to find gross income. The adoption of the Commissioner's position would result in a tax on gross receipts, a result that has been repeatedly rejected. E.g., *Sullenger v. Commissioner*, 11 T.C. at 1077.

In support of his argument concerning the tax benefit rule, the Commissioner relies on *Hillsboro National Bank v. Commissioner*, and *United States v. Bliss Dairy, Inc.*, 460 U.S. 370 (1983) (*Bliss Dairy*), where the Supreme Court held that under the tax benefit rule, a distribution of property in liquidation was fundamentally inconsistent with a prior deduction of the cost of that property and required an adjustment be made to "cancel out" the prior deduction. For its taxable year ending June 30, 1973, the taxpayer in that case, a closely held corporation and a cash method taxpayer, deducted, under section 162, the full cost of cattle feed purchased for use in its business. A substantial portion of the feed was on hand at the end of the taxable year. On July 2, 1973, the taxpayer adopted a plan of liquidation under sections 333 and 336. During the month of July 1973, the taxpayer distributed its assets, including the remaining

cattle feed, to its stockholders. Under section 336, the taxpayer reported no income on the liquidation. The stockholders continued to operate the dairy business in noncorporate form. They acquired basis in the feed pursuant to section 334(c) and, in turn, deducted this basis as an expense of doing business under section 162.

Relying on the tax benefit rule, the Commissioner challenged the taxpayer's treatment of the transaction and asserted that it should have taken into income during its final tax year the value of the feed distributed to the stockholders. In *Bliss Dairy*, the Supreme Court agreed with the Commissioner, and remanded the case for a determination of the proper increase in taxable income to the taxpayer, measured by the cost of the feed on hand at the time of liquidation. The Supreme Court stated:

The basic purpose of the tax benefit rule is to achieve rough transactional parity in tax, * * * and to protect the Government and the taxpayer from the adverse effects of reporting a transaction on the basis of assumptions that an event in a subsequent year proves to have been erroneous. * * * [460 U.S. at 383.]

Furthermore, the Supreme Court stated:

The tax benefit rule does not permit the Commissioner or the taxpayer to rematch properly recognized income with properly deducted expenses; * * * [460 U.S. at 389 n. 24.]

The Court reasoned that, if a taxpayer converts an expensed asset to some other nonbusiness use, that action is inconsistent with its earlier deduction and the tax benefit rule requires inclusion in income of the amount of the unwarranted deduction. The taxpayer, in distributing the feed to its stockholders, turned the expensed asset to a nonbusiness use, requiring it to take into income the amount of the earlier deduction.

The Commissioner's argument overlooks a significant distinction between the facts of *Bliss Dairy* and the case now before us. In *Bliss Dairy*, the taxpayer claimed a deduction for the costs of inventory, but it distributed that inventory in liquidation and reported no income associated with such inventory. In contrast, Digital reported $1,137,200 of income attributable to the incomplete contracts that would not have been reportable for its 1976

taxable year if it had not liquidated and offset against that income the costs of the inventory associated with the performance of such contracts. Therefore, unlike the taxpayer in *Bliss Dairy*, Digital matched income received from its manufacturing business with the cost of goods sold to produce such income. Digital's liquidation does not act to retroactively remove Digital from the ACTA scanner manufacturing business. The fact that the inventory is includable in the bases of the stockholders also does not warrant the application of the tax benefit rule. Distributions by a corporation in liquidation made before the effective date of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, were generally not taxable to the corporation.[6] The distributions in liquidation were taxable to the stockholders (sec. 331), and the stockholders were entitled to treat as bases the amounts so includable in their gross income (sec. 334). Thus, it is because the stockholders were taxable on the distributions by Digital that they can treat the inventory as a part of their bases. There is nothing inconsistent between that treatment and allowing Digital to offset the costs of the inventory against the income reported by it from the incomplete contracts. Under these circumstances, we need not pass on the parties' argument concerning whether the tax benefit rule is applicable only to deductible items or whether it also applies to the costs of inventory.

Nor is there merit in the Commissioner's contention that under the all events test an inventory cost is not taken into consideration until there is a sale of the inventory. When setting forth how a manufacturer may account for the sale of an item, section 1.446-1(c)(1)(ii), Income Tax Regs., states that section 1.451-5 of the regulations provides guidance concerning accounting for advance payments. Section 1.451-5 of the regulations makes no mention of the all events test, and paragraph (f) thereof expressly requires the reporting of advance payments in gross income on liquidation, even though the sales with which they are associated are not yet completed and reportable. In addition, this Court has previously stated that the all events test should

---

[6] Sec. 336(b)(1) did provide that a distribution of LIFO inventory would require the corporation to report certain amounts in income, but the parties agree that such provision is not applicable in this case.

not always be applied in determining the cost of inventory. *Molsen v. Commissioner*, 85 T.C. 485, 503-505 (1985). We conclude that such test should not be applied to deny Digital an inventory offset when Digital is required to recognize a substantial amount of the income associated with such inventory.

The most significant argument to be resolved is whether the allowance of the offset for the closing inventory clearly reflects income. The petitioners contend that Digital's treatment of the income and costs attributable to the incomplete contracts properly reflected the profit earned on those contracts before liquidation. The petitioners contend that use of the percentage of completion method produces a result substantially the same as that produced by the inventory offset employed by Digital.

Craig Hihn, C.P.A., testified as an expert witness on behalf of the petitioners. Mr. Hihn attempted to demonstrate that if the income of Digital for its 1976 taxable year is computed in accordance with the acceptable methods for calculating income from incomplete long-term contracts, the results are substantially similar to the profit reported by Digital. In his expert witness report,[7] he concluded that if Digital had used the costs-incurred alternative of the percentage of completion method of reporting income, it would have reported a gross profit for its 1976 taxable year of $694,859, rather than the $673,339 reported by it on its corporate income tax return for such year. On cross-examination, counsel for the Commissioner pointed out an error in the figure used by Mr. Hihn as the costs to be incurred to complete the contracts. If we correct that error, the result of Mr. Hihn's calculations is that Digital would have had gross profit of $726,718 for its final taxable year.[8]

---

[7]Under Rule 143(f)(1) of the Tax Court Rules of Practice and Procedure, an expert witness must generally prepare a written report for submission to the Court and to the opposing party.

[8]Mr. Hihn also presented a calculation of Digital's profit for its 1976 taxable year by use of the work-performed alternative of the percentage of completion method for computing income. In that calculation, he had to estimate the work that had been performed on each of the incomplete contracts. Thus, his conclusion rested on estimates that were at best subjective and that appear to fail to take into consideration the substantial work performed by the subcontractors who produced large components for Digital. Moreover, in his calculation, he included portions of the completed contract prices, but he did not take into consideration the costs attributable to the earning of such income. For these reasons, we found that calculation not to be helpful.

The relevant calculations are set forth below:

| | | |
|---|---:|---:|
| Estimated total cost of incomplete contracts | $1,800,000 | |
| Incomplete contract cost incurred to 9/18/75 | 854,068 | |
| Percent completion[9] | 47.4 | |
| Total price of incomplete contracts | 2,365,500 | |
| Total price of incomplete contracts earned [10] | | $1,121,247 |
| Billings on completed contracts | | 2,024,250 |
| Total contract income earned as of 9/18/75 | | 3,145,497 |
| Less: Total contract cost as of 9/18/75 [11] | 2,442,792 | |
| Net AZOR adjustment | 24,013 | 2,418,779 |
| Gross profit | | 726,718 |

The Commissioner challenges Mr. Hihn's costs-incurred analysis. The Commissioner contends that the proper total cost estimate is $1,009,278, consisting of costs incurred of $854,068 for the inventory and $155,210 for payments by Residual to complete the incomplete contracts. Using these costs, the nine contracts were 85 percent complete, resulting in a total price of incomplete contracts earned of $2,010,675 and a gross profit of $1,546,814.[12]

In our view, the Commissioner's method of computing Digital's income for its 1976 taxable year clearly does not properly reflect income and is unreasonable. See *Bay State Gas Co. v. Commissioner*, 75 T.C. at 422-424. In other cases where corporate taxpayers, which were operating on the completed contract method, liquidated and distributed their incomplete contracts to their stockholders, the Commissioner has exercised the discretion granted him by section 446 and has placed the taxpayer on a percentage of completion method of accounting to insure that profits earned by the corporation prior to liquidation were taxed to the corporation. See *Standard Paving Co. v. Commissioner*,

---

[9]Percent completion $=$ Cost incurred/Estimated total cost
$$= \$854,068/\$1,800,000$$
$$= 47.4$$

[10]Total price of incomplete $=$ Percent completion $\times$ Total price of incomplete
contracts earned                      contracts
$$= 47.4\% \times \$2,365,500$$
$$= \$1,121,247$$

[11]Total contract cost $=$ Completed contract $+$ Incomplete contract cost
             cost                incurred to 9/18/75
$$= \$1,588,724 + \$854,068$$
$$= \$2,442,792$$

[12]Because of the decrease made to Mr. Hihn's original amount for costs incurred to Sept. 18, 1975, and because of rounding by the Commissioner, the total price of incomplete contracts earned is $2,001,725 and the gross profit is $1,607,196.

190 F.2d 330 (10th Cir. 1951), affg. 13 T.C. 425 (1949); *Jud Plumbing & Heating, Inc. v. Commissioner*, 153 F.2d 681 (5th Cir. 1946), affg. 5 T.C. 127 (1945). Those cases furnish a sound basis for computing the income reportable by Digital. Thus, it must report an appropriate portion of the contract prices earned before its liquidation, but it is also entitled to account for an appropriate portion of the costs attributable to the earning of such income. The Commissioner would require it to report such income but would not allow it to reduce such income by the appropriate costs. The refusal to allow any costs violates the objectives of sound income tax accounting. See secs. 1.446-1(a), 1.451-1(a), Income Tax Regs.

We find that the gross profit estimates provided by the percentage of completion method using Mr. Hihn's calculations, as corrected, furnish a persuasive basis for deciding this case. Such estimates are the product of a methodology set forth in the regulations. The Commissioner's contention that the total cost estimate should be $1,009,278 rather than $1,800,000 used by Mr. Hihn is not persuasive. The Commissioner's estimate is simply the cost of Digital's inventory on September 18, 1975, and the cost to Residual to complete the contracts. Mr. Hihn's estimate is the cost of Digital's inventory and the estimated cost of Digital to complete the contracts. Residual's costs are not relevant to our inquiry; only Digital's costs are relevant under the costs-incurred alternative. See *Midland-Ross Corp. v. United States*, 485 F.2d 110 (6th Cir. 1973). Moreover, Pfizer's agreement to complete the contracts for only $110,000 was only one provision of an arrangement which included the transfer by Georgetown University of certain patent rights to Pfizer and the payment by Pfizer of substantial amounts to support research at the university; it would be inappropriate to place great weight on the one provision without considering the other provisions of the arrangement.

In conclusion, we believe that Mr. Hihn's calculation demonstrates that the Commissioner was unreasonable in not allowing any costs attributable to the income from the incomplete contracts. However, we also believe that such calculation shows that Digital should have reported more of the profits from the incomplete contracts on its return for

its 1976 taxable year. We hold that the computation of profit by use of the costs-incurred alternative of the percentage of completion method most properly reflects income for Digital's final taxable year and that its income must be recomputed in accordance with our calculations.

The next issue for decision is whether the stock that was transferred by Digital to Messrs. Golab, Rotolo, and Wilson, when added to their other compensation, was reasonable compensation for services performed for Digital. The burden of proving reasonableness is upon the petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure; *Botany Mills v. United States*, 278 U.S. 282 (1929).

Section 162(a)(1) provides that in computing its taxable income, a corporation shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered."

The question of what constitutes reasonable compensation for personal services is a question of fact to be determined from all the facts and circumstances of the case. *Geiger & Peters, Inc. v. Commissioner*, 27 T.C. 911, 920-921 (1957). Generally, reasonable compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. Sec. 1.162-7(b)(3), Income Tax Regs. Among the facts and circumstances to be considered by the Court are:

the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [*Mayson Mfg. Co. v. Commissioner*, 178 F.2d 115, 119 (6th Cir. 1949), affg. a Memorandum Opinion of this Court.]

The manner of fixing compensation is not decisive as to deductibility. If contingent compensation is paid pursuant to a free bargain between the employer and the employee made before the services are rendered, and is not influenced by any consideration on the part of the employer other than

securing the services of the employee on fair and advantageous terms, then the compensation should be allowed as a deduction even though the actual amount paid is greater than the amount which would ordinarily be paid. Sec. 1.162-7(b)(2), Income Tax Regs.; see also *Hundley v. Commissioner*, 48 T.C. 339 (1967); *Stone Trust v. Commissioner*, 44 T.C. 349 (1965).

An employer may compensate an employee for his services by giving him stock or other property which is subject to restrictions, such as restrictions on sale, or a requirement that the property be returned if the employee leaves his job. Sec. 83(a); sec. 1.83-1(a), Income Tax Regs.; see, e.g., *Richardson v. Commissioner*, 64 T.C. 621 (1975). An employer who gives restricted property as compensation for services may take a business deduction under section 162. The amount of the deduction is equal to the amount includable as compensation in the gross income of the employee, but only to the extent that such amount meets the requirements of section 162. Sec. 83(h); sec. 1.83-6, Income Tax Regs.; see also *Steinberg v. Commissioner*, T. C. Memo. 1983-534, affd. per curiam sub nom. *Pulte Home Corp. v. Commissioner*, 771 F.2d 183 (6th Cir. 1985). If a stockholder transfers property to an employee of the corporation as compensation for his services to the corporation, the corporation is allowed a deduction for such compensation, and the stockholder is considered to have made a contribution to the capital of the corporation. Sec. 1.83-6(a), (d)(1), Income Tax Regs.

The Commissioner argues that the salaries and bonuses Messrs. Golab, Rotolo, and Wilson received constituted reasonable compensation for their services and that the amount of the stock transfer, $249,000, is not deductible. He supports his argument by claiming that the three employees only worked for 13 or 14 months and that they only worked part-time. In addition, the Commissioner asserts that the services provided by the three employees involved commercial production of the ACTA scanner; they were not being compensated for their work in inventing the ACTA scanner. The Commissioner's determination results in total compensation in 1974 and 1975 from Digital of

$63,178 for Mr. Golab, approximately $55,655 for Mr. Rotolo, and approximately $48,281 for Mr. Wilson.

In the alternative, the Commissioner contends that even if the amounts are reasonable, they represent distributions of earnings rather than compensation for services rendered and, therefore, are not deductible. In support of this contention, he claims that Dr. Ledley's offer in August 1974 to pay Messrs. Golab, Rotolo, and Wilson remuneration in "six figures" if the ACTA scanner was a success was clearly an offer to share the profits of Digital. In addition, he notes that the consent action executed by Dr. Ledley as the sole stockholder of Digital states that the bonuses received by, among others, Messrs. Golab, Rotolo, and Wilson represented fair additional compensation for their services. Furthermore, he points out that the stock issuance and redemption agreement states that the stock was transferred to provide Messrs. Golab, Rotolo, and Wilson with an incentive for future work at Digital. Finally, the Commissioner claims that the reduction in Digital's corporate tax which resulted from the stock transfer and the fact that Digital had never declared a dividend indicate that the transfer was in fact a dividend distribution and, therefore, not deductible.

The "six figure" compensation agreed to by Dr. Ledley was reasonable under the circumstances. Dr. Ledley was the sole stockholder of Digital at the time he made the contingent compensation offer to Messrs. Golab, Pence, Rotolo, and Wilson. In addition, he was not related to any of those petitioners. Furthermore, Dr. Ledley had an economic interest which was adverse to those of Messrs. Golab, Rotolo, and Wilson; the more they received from Digital, the less Dr. Ledley received. Therefore, Dr. Ledley had no incentive to overcompensate his employees. Finally, given the facts that each ACTA scanner sold for over $250,000 and that the prototype had received a great deal of attention, "six figure" compensation was reasonable for vital employees.

The services provided by Messrs. Golab, Rotolo, and Wilson were essential to the success of Digital, and their qualifications made them uniquely qualified for their jobs. Each of these petitioners was an expert in the field of

computer applications in medicine. They were each pioneers in the field, with a wealth of experience which would be hard to replace. In particular, they helped produce the prototype ACTA scanner, and they were familiar with both the theory and the mechanics behind the ACTA scanner. Their task was to standardize the individually crafted prototype ACTA scanner, and the petitioners actively participated in making the adjustments necessary to achieve standardization. Dr. Ledley testified that there was no one else in the world who had the knowledge necessary to carry out the tasks needed to fulfill Digital's contract commitments. Their knowledge of the ACTA scanner was a significant aid in economically developing more durable and commercially manufacturable parts and systems.

Messrs. Golab, Rotolo, and Wilson worked a substantial number of hours for Digital. Mr. Golab testified that, in June through August 1974, he probably averaged 40 to 50 hours per month over the normal 8 hour day, and that after August 1974, his overtime increased so that it exceeded 100 hours per month at the end of 1974. Mr. Golab's recollection concerning his work hours was very good because he kept a record of such hours, and he produced a summary of such records at trial. In addition, Messrs. Rotolo and Wilson worked a comparable number of hours.

The petitioners presented the testimony of an expert witness on the compensation of medical personnel, Phyllis Pricer, who testified that a reasonable compensation for individuals such as Messrs. Golab, Rotolo, and Wilson would have been $60,000 to $70,000 per year plus a percentage of the profits of their invention. However, in view of the unique qualifications of Messrs. Golab, Rotolo, and Wilson and the substantial number of hours worked by them, comparisons as to what amount would ordinarily be paid for like services under similar circumstances are not helpful. In addition, the salaries received by Messrs. Golab, Rotolo, and Wilson in research or faculty positions are not very relevant to our inquiry.

We observe that the Commissioner has raised certain concerns relating to the fact that during most of the time in issue, Messrs. Golab, Rotolo, and Wilson were on the NBRF payroll, in addition to working for Digital. In fact, the time

spent working for each of the two employers during the regular work week may have been blurred. However, we are convinced that Messrs. Golab, Rotolo, and Wilson worked a substantial number of hours for Digital and that their expertise was vital to the success of Digital.

The "six figure" compensation agreement was a compensation agreement and not a profit-sharing agreement. Dr. Ledley offered the other petitioners and Mr. Pence substantial compensation, in the six-figure range, if they remained in the employ of Digital until its operations proved profitable. The agreement was never reduced to writing, no percentage of profits was ever discussed, and Messrs. Golab, Rotolo, and Wilson were not sure what they would receive for their efforts. Messrs. Golab, Rotolo, and Wilson were not stockholders at the time the offer was made, and they had no legal right to share in Digital's profits. The payment of such compensation, if any, would have reduced Dr. Ledley's income from Digital. Additionally, the agreement was clearly an attempt by Dr. Ledley to motivate Messrs. Golab, Rotolo, and Wilson to stay in the employ of Digital, despite the long hours of work required.

The Commissioner notes that the stock issuance and redemption agreement states that the stock was transferred to Messrs. Golab, Rotolo, and Wilson "in order to provide them with an incentive for their continued performance of faithful service on behalf of" Digital. Dr. Ledley testified that the transfer was made because he was not sure the transaction with Pfizer would actually occur, and he wanted to provide his key employees with proof that their efforts would be rewarded so that they would not leave Digital. The fact that Dr. Ledley was given a proxy to vote the shares of Messrs. Golab, Rotolo, and Wilson supports his testimony that he was not sure such transaction would occur. Dr. Ledley was a very credible witness, and we accept his explanation.

In addition, the Commissioner observes that the consent action executed by Dr. Ledley and dated August 29, 1975, states that the bonuses paid to Messrs. Golab, Rotolo, and Wilson represented "fair additional compensation for the many overtime hours, Saturdays and Sundays of work given by these employees over the past two years."

Therefore, the Commissioner asserts that payments beyond their salaries and bonuses was not compensation for services rendered. We have concluded that, as of August 1974, there was an agreement for six-figure compensation if Digital was successful and that the compensation, including the value of the stock, was reasonable. We observe that Messrs. Golab, Rotolo, and Wilson did not sign the consent action. Therefore, based on the evidence before us, we believe that the recital in the consent action does not constitute a statement of the intent of the petitioners.

Finally, the Commissioner, citing *Schneider & Co. v. Commissioner*, 500 F.2d 148, 152 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, states that most reasonable compensation cases involving successful, closely held corporations look to whether the alleged compensation was a substitute for a failure to declare dividends. As the Commissioner views the case, the stock transfer was a mechanism to provide a dividend by Digital, which had not declared a dividend while the ACTA scanners were being manufactured. We disagree. Messrs. Golab, Rotolo, and Wilson were not stockholders until the stock transfer, and therefore, they had no right to a dividend until the stock was transferred to them. Under these circumstances, we conclude that the six-figure compensation agreement was a good-faith contingent compensation agreement and not an attempt to distribute profits or dividends and that such compensation was reasonable. See *Home Interiors & Gifts, Inc. v. Commissioner*, 73 T.C. 1142 (1980); *Streckfus Steamers, Inc. v. Commissioner*, 19 T.C. 1 (1952); *Good Chevrolet v. Commissioner*, T. C. Memo. 1977-291.

*Decisions will be entered under Rule 155.*